979 F.2d 332
 61 USLW 2282, Fed. Sec. L. Rep. P 97,054,
23 Fed.R.Serv.3d 1141, 36 Fed. R. Evid. Serv. 1491
 Doris I. SANDBERG, individually and on Behalf of other
minority stockholders, Plaintiff-Appellant,
v.
VIRGINIA BANKSHARES, INC.; First American Bankshares, Inc.;
Jack W. Beddow; Milton L. Drewer, Jr.; E. Guy Ridgely;
Emanuel A. Baker, Jr.; Harriet F. Bradley; Joel T.
Broyhill; Thomas B. Chamberlin; Thomas P. Chisman; Sidney
O. Dewberry; Eric W. Erdossy; George W. Johnson; Charles
T. Lindsay, Jr.; Donald R. Maxfield; Linda H. Michael;
Milton V. Peterson; Glenn W. Saunders, Jr.; Charles H.
Smith, Jr.; Verlin W. Smith; Henry A. Thomas; Stephen G.
Yeonas, Defendants-Appellees,
and
Thomas G. Mays; Dwight C. Schar, Defendants.
Paul H. WEINSTEIN; Roslyn Weinstein; Jay Weinstein;
Richard Weinstein; Helen Weinstein; Leonard Weinstein;
Evelyn Bushwick; Gary Plushnick; Carol V. Plushnick;
William Dockser; Laura Lee Cookson; Philip Gross; Nancy
Gross; John P. Kyle; Kay Kyle; Robert I. Schattner;
Helen Mackey Gray; Dante E. Guazzo; General Harry J.
Engel; Helen D. Engel; Joseph M. Eller; Barbara L. Eller;
Henry P. Deyerle, Individually and as Executor of the
Estate of Evelyn B. Deyerle; W.G. Dolvin; Cynthia B.
Dolvin; Kathryn M. Everhart; Norman T. Henry; Omer L.
Hirst; Katherine Ann Johnson; Dorothy Fowler
Cooper; Thelma H. Loehler; Edward S. Loveless; Michael A.
Puzak; Elizabeth K. Puzak; Benjamin Weiner; Said Haddad;
Harold E. Shomo; Joseph B. Latshaw, Jr.; P.S. Webb
Company; Claude E. Keener, Sr.; Claude E. Keener, Jr.;
Luther A. Gilliam; Foundation for Middle East Peace;
William L. Mason, By and Through First Florida Bank, N.A. as
Trustee of the William L. Mason Trust dated 6/21/77 as
restated 1/21/89; Rudolph A. Dinunzio; Jane M. Dinunzio;
Anna C. Hooker; Stephen Hartwell; Dorothy V. Tobin; Ethel
J. Reid; Suzanne Hooker Evans; Patricia Hooker Bonnes;
Joseph Edmund Hooker; Kathryn Hooker Spradlin; Mary Helen
Walter; Eugene Hooker Walter; Steven Daniel Weybright;
Rebecca Weybright; David Hooker Weybright; Anne Carol
Weybright; Nokesville Church of the Brethren; Robert
Walter; Bernice Walter; Elizabeth H. Nixon; Stephen W.
Hartwell, II; Anthony Colasanto; Edwin Lynch; Helen M.
Lynch; Clarice Brault, Plaintiffs-Appellants,
v.
FIRST AMERICAN BANKSHARES, INC.; Virginia Bankshares, Inc.;
Jack W. Beddow; Milton L. Drewer, Jr.; E. Guy Ridgely;
Emanuel A. Baker, Jr.; Harriet F. Bradley; Joelt.
Broyhill; Thomas B. Chamberlin; Thomas P. Chisman; Sidney
O. Dewberry; Eric W. Erdossy; George W. Johnson; Charles
T. Lindsay, Jr.; Donald R. Maxfield; Linda H. Michael;
Milton V. Peterson; Glenn W. Saunders, Jr.; Charles H.
Smith, Jr.; Verlin W. Smith; Henry A. Thomas; Stephen G.
Yeonas, Defendants-Appellees.
 Nos. 91-1873, 91-1874.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1992.
Decided Oct. 21, 1992.
As Amended Nov. 17, 1992.
Motion to Vacate Opinion and Remand Grant April 7, 1993.
 
 Joseph Mark Hassett, Hogan & Hartson, Washington, D.C., argued (John C. Keeney, Jr., George H. Mernick, III, Albert W. Turnbull, Gregory A. Kalscheur, on the brief), for plaintiffs-appellants.
 John Sutton Stump, McGuire, Woods, Battle & Boothe, McLean, Va., Lawrence C. Marshall, Mayer, Brown & Platt, Chicago, Ill., argued (Sean F. Murphy, Robert R. Vieth, McGuire, Woods, Battle & Boothe, McLean, Va., Stephen M. Shapiro, Andrew L. Frey, Kenneth S. Geller, Mayer, Brown & Platt, Chicago, Ill., Stephen M. Sayers, Thomas J. Cawley, Hunton & Williams, Fairfax, Va., on the brief), for defendants-appellees.
 Before HALL and WILLIAMS, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 This case is before us for the third time, although it presents new issues that we previously were not required to address. Following our first decision, the Supreme Court reversed our judgment and remanded for further consideration. Sandberg v. Virginia Bankshares, Inc., 891 F.2d 1112 (4th Cir.1989), rev'd and remanded, --- U.S. ----, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (Sandberg/Weinstein ). Specifically, the Court overturned the jury verdict for Plaintiffs on their federal securities law claim. We remanded to the district court to assess the effect of the Supreme Court's decision on Plaintiffs' other claim for breach of fiduciary duties under Virginia law.
 
 
 2
 On remand, the district court held that Virginia law placed a cap on the liability of the directors of the First American Bank. The district court found that Plaintiffs had waived their challenge to the application of the cap. The court vacated the two judgments (Sandberg and Weinstein ) from which the original consolidated appeal was taken and certified a class that included both sets of plaintiffs. The district court also denied Plaintiffs'[1] motion for a new trial against First American Bankshares and Virginia Bankshares, both of which had prevailed on the fiduciary duties claim in the original trial. In its motion, Plaintiffs urged that the district court had erred in denying a motion to compel discovery on the ground of attorney-client privilege. Plaintiffs then appealed to this Court.
 
 
 3
 We agree with the district court that the Weinstein Plaintiffs have waived their challenge to the applicability of the cap. Because we find that the cap does not apply in Sandberg, however, we vacate the district court's judgment and remand. Furthermore, because we conclude that the evidence Plaintiffs sought was not privileged, we reverse the district court's denial of a new trial.
 
 
 4
 * In December 1986, First American Bankshares, Inc. (FABI), a bank holding company, sought to consolidate its operations by merging the First American Bank, Inc. (Bank), with Virginia Bankshares, Inc. (VBI) (VBI and FABI are collectively referred to as Bankshares). VBI, a wholly owned subsidiary of FABI, owned 85% of the Bank's stock. Some 2,000 minority shareholders held the remaining 15% of the Bank's stock. FABI hired an investment banking firm, which recommended $42 per share as an appropriate price for the stock of the minority shareholders. The Bank did not obtain an independent valuation of the stock on behalf of the minority shareholders. The executive committee of the Bank approved the merger proposal at the recommended price, and the Bank's full board followed suit.
 
 
 5
 The directors of the Bank (Directors) solicited proxies for voting on the proposal at the annual shareholders' meeting set for April 21, 1987. In their solicitation, the directors urged adoption of the proposal and stated that the merger plan was in the best interests of minority shareholders because the price to be paid for the stock, $42, was thirty percent higher than the price at which the stock then traded.
 
 
 6
 Appellant Doris I. Sandberg, who owned 2,442 shares, did not give the requested proxy. After the shareholders approved the merger, Sandberg filed suit in the United States District Court for the Eastern District of Virginia against Bankshares and the Directors. She raised two claims: one for soliciting proxies in violation of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1988),[2] and Securities and Exchange Commission (SEC) Rule 14a-9, 17 C.F.R. 240.14a-9 (1992);[3] the other for breaching fiduciary duties owed to the minority shareholders under state law.[4] The district court denied Sandberg's motion to certify a class of minority shareholders.
 
 
 7
 The jury found that all the Defendants had violated § 14(a) and Rule 14a-9, but that only the Directors had breached their fiduciary duties. The jury determined that Sandberg was entitled to $18 per share above the $42 price authorized at the shareholders meeting. Her award totaled $43,956. The district court entered the jury's finding on the state law claim as an "alternative judgment."[5]
 
 
 8
 While Sandberg's case was pending, Appellant Weinstein and several other minority shareholders brought a separate action against Bankshares and the Directors in the United States District Court for the District of Columbia. Weinstein, like Sandberg, had withheld his proxy. The case was transferred to the Eastern District of Virginia. Following the Sandberg judgment, the district court applied issue preclusion and granted the Weinstein Plaintiffs summary judgment as to liability on both the federal securities law claim and the breach of fiduciary duties claim. The district court entered a judgment of $3,292,236 on the federal securities law claim, and entered an alternative judgment of $2,346,553.34 against the Directors for breach of fiduciary duties. The alternative judgment reflected the cap on the liability of corporate directors imposed under Virginia law. Va.Code Ann. § 13.1-692.1 (Michie 1989).
 
 
 9
 Defendants appealed both Sandberg and Weinstein to this Court. We affirmed the district court judgments, including the application of the damage cap in Weinstein, but reversed the denial of class certification in Sandberg. Sandberg/Weinstein, 891 F.2d at 1126. Because we affirmed, we did not address Plaintiffs' contention on cross-appeal that they were entitled to a new trial against Bankshares on the breach of fiduciary duties claim because the district court had erroneously denied a motion to compel discovery on the ground of privilege. We remanded to the district court with instructions to certify a class including all minority shareholders except the Weinstein Plaintiffs and the Directors. Id. at 1126-27. Defendants then appealed to the Supreme Court.
 
 
 10
 On appeal to the Supreme Court, the Defendants argued that they were not liable under § 14(a) and Rule 14a-9 because the misrepresentations in the proxy statements were merely statements of opinion. Sandberg/Weinstein, --- U.S. at ----, 111 S.Ct. at 2757. Defendants also argued that Plaintiffs had not proven causation because the Bank controlled enough stock to authorize the merger without the approval of any minority shareholders. Id. at ----, 111 S.Ct. at 2761. The Supreme Court reversed our judgment for Plaintiffs, holding that they had failed to show causation. They rejected Defendants' first argument, however, and held that "knowingly false statements of reasons may be actionable" even though the statements were expressed as opinions. Id. at ----, 111 S.Ct. at 2755.
 
 
 11
 On remand from the Supreme Court, Plaintiffs moved this Court to affirm the alternative judgments for breach of fiduciary duties. We denied the motion without prejudice and remanded to the district court to consider the effect of the Supreme Court's holding upon the alternative judgments in Sandberg and Weinstein for breach of fiduciary duties.
 
 
 12
 On remand, the district court certified a class of minority Bank shareholders who had been entitled to vote on the merger, excluding the Directors but including the Weinstein Plaintiffs. The district court also vacated both the Weinstein and Sandberg judgments and entered judgment on the claim for breach of fiduciary duties in favor of the named class.[6] The district court rejected Plaintiffs' argument that the jury had found a knowing violation of a federal securities law, which would have rendered the cap inapplicable under § 13.1-692.1(B) of the Virginia Code. Without the cap, the award to the class would have exceeded $12.2 million. The capped award was $2,346,553.34. The district court also denied Plaintiffs' motion for a new trial against Bankshares on the claim for breach of fiduciary duties. In their motion, Plaintiffs renewed their argument that the district court had erred in denying a motion to compel discovery. The district court previously had determined that the attorney-client privilege protected the evidence Plaintiffs sought.
 
 
 13
 Plaintiffs now appeal both the district court's determination that the damage cap was applicable and the denial of a new trial against Bankshares.[7]II
 
 
 14
 As a result of the Supreme Court's reversal on the federal securities law claim, Plaintiffs' sole ground for recovery against the Directors is their successful claim for breach of fiduciary duties under Virginia law. Plaintiffs contend that the district court erred in holding that § 13.1-692.1 of the Virginia Code limited their recovery on the state law claim.[8] Section 13.1-692.1 provides in part:
 
 
 15
 A. In any proceeding brought by or in the right of a corporation or brought by or on behalf of shareholders of the corporation, the damages assessed against an officer or director arising out of a single transaction, occurrence or course of conduct shall not exceed the lesser of:
 
 
 16
 1. The monetary amount, including the elimination of liability, specified in the articles of incorporation or, if approved by the shareholders, in the bylaws as a limitation on or elimination of the liability of the officer or director; or
 
 
 17
 2. The greater of (i) $100,000 or (ii) the amount of cash compensation received by the officer or director from the corporation during the twelve months immediately preceding the act or omission for which liability was imposed.
 
 
 18
 B. The liability of an officer or director shall not be limited as provided in this section if the officer or director engaged in willful misconduct or a knowing violation of the criminal law or of any federal or state securities law, including, without limitation, any claim of unlawful insider trading or manipulation of the market for any security.
 
 
 19
 (emphasis added).
 
 
 20
 Plaintiffs contend that the cap does not apply because the jury found that the Directors knowingly violated Rule 14a-9. Although Plaintiffs never squarely put this factual issue before the jury, they contend that, under the jury instructions, the jury necessarily found a knowing violation. Before addressing Plaintiffs' contention, we must determine whether they waived their challenge to the cap by not raising the issue at trial. If not, then we must determine whether the jury verdict can be construed as finding a knowing violation of Rule 14a-9 and, if so, whether this finding renders the cap inapplicable.
 
 
 21
 * Whether Plaintiffs waived their challenge to the applicability of the cap depends on whether they should have challenged the cap at trial. Arguments that could have been raised at trial, but were not, will not be considered on remand. See Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc., 974 F.2d 502, 505 (4th Cir.1992) (an argument not raised on initial appeal will not be considered on remand); United States v. One 1971 Mercedes Benz 2-Door Coupe, 542 F.2d 912, 915 (4th Cir.1976) (failure to raise and preserve issue at trial waives consideration of that issue on appeal), Nevertheless, arguments not relevant at the first trial may be considered on remand. Cf. Quern v. Jordan, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979) (a party may raise on remand all issues not expressly or impliedly decided on appeal).
 
 
 22
 In Weinstein, the cap was relevant because the Weinstein Plaintiffs' anticipated recovery exceeded the statutory limit. In fact, the cap resulted in a reduced alternative judgment. While the Weinstein Plaintiffs challenged the constitutionality of the cap in their initial appeal (a challenge that we rejected, Sandberg/Weinstein, 891 F.2d at 1125), they failed to challenge the applicability of the cap based on the exception for knowing violations of federal securities laws. They have therefore waived that challenge, see One 1971 Mercedes Benz 2-Door Coupe, 542 F.2d at 915, and their recovery is limited to their original capped alternative judgment.
 
 
 23
 In Sandberg, however, the cap was not at issue. Once the district court denied class certification, Sandberg's maximum recovery was far less than the statutory limit. Sandberg, therefore, had no reason to litigate the applicability of the cap. After both this Court's reversal on class certification and the Supreme Court's reversal on the federal securities claim, the cap became relevant because the anticipated recovery for the class on the state law claim exceeded the statutory limit. Because the damage cap was irrelevant during the course of the Sandberg trial, we conclude that the exceptions to the cap urged by the Sandberg Plaintiffs were timely raised.
 
 B
 
 24
 We next address whether the cap applies in Sandberg. This issue turns on whether the Directors knowingly violated federal securities law, a factual issue that Plaintiffs claim has already been decided. Specifically, Plaintiffs urge us to construe the jury verdict as a finding that the Directors knowingly violated Rule 14a-9. On that basis, they urge us to hold that the cap does not apply. The Directors contend that their knowledge was never an issue at trial, and that the jury made no findings on that issue.
 
 
 25
 Plaintiffs seek to apply the jury's finding that the Directors violated Rule 14a-9 to determine the separate issue of whether the Directors' liability for breach of fiduciary duties is limited by the cap in § 13.1-692.1 of the Virginia Code. Plaintiffs thus seek to apply a factual finding in one context to an issue in a separate context. To do so, they must satisfy the requirements of issue preclusion. Applying principles of issue preclusion, we conclude that the jury found the Directors acted in conscious disregard of whether the proxy statement contained misrepresentations, and that such knowledge satisfies the "knowing violation" requirement of § 13.1-692.1. Accordingly, we find that the jury verdict establishes that the Virginia liability cap is inapplicable.
 
 
 26
 The doctrine of issue preclusion forecloses the "relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." Virginia Hosp. Ass'n v. Baliles, 830 F.2d 1308, 1311 (4th Cir.1987).[9] Generally only a final, valid judgment will be given preclusive effect, Restatement (Second) of Judgments § 27 (1982), although finality in some contexts is modified into a rule of "practical" finality, as is discussed further below. Courts generally apply issue preclusion only when no unfairness results. Swentek v. USAIR, Inc., 830 F.2d 552, 561 (4th Cir.1987). Among the factors considered in evaluating fairness are whether the party had incentives to litigate fully an issue in the first instance and whether the role of the issue in the second action was foreseeable in the first action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 332, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979); 18 Charles A. Wright et al., Federal Practice and Procedure § 4416, at 138 (1981).[10]
 
 
 27
 Issue preclusion is normally committed to the broad discretion of the district courts. Parklane Hosiery Co., 439 U.S. at 331, 99 S.Ct. at 651; Dracos v. Hellenic Lines, Ltd., 762 F.2d 348 (4th Cir.), cert. denied, 474 U.S. 945, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985). Nonetheless, at least three circuits have concluded that issue preclusion presents some questions that should be reviewed de novo. United States v. Sandoz Pharmaceuticals Corp., 894 F.2d 825, 826 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990); Dixie Nat'l Life Ins. Co. v. McWhorter (In re McWhorter), 887 F.2d 1564, 1566 (11th Cir.1989); United States v. Geophysical Corp., 732 F.2d 693, 697 (9th Cir.1984). These circuits distinguish between the "availability" of issue preclusion, which they review de novo as a mixed question of law and fact, and its "applicability," which they review for abuse of discretion. E.g., Geophysical Corp., 732 F.2d at 697. Although these courts do not define "availability" or "applicability," in practice they review de novo whether each of the requirements for issue preclusion have been met, and then review for abuse of discretion whether issue preclusion is fair. See Sandoz Pharmaceuticals Corp., 894 F.2d at 828.
 
 
 28
 We agree that many of the requirements of issue preclusion are mixed questions of law and fact that should be reviewed de novo. Geophysical Corp., 732 F.2d at 697; see Rawl v. United States, 778 F.2d 1009, 1014 & n. 9 (4th Cir.1985) (mixed questions of law and fact reviewed de novo), cert. denied, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986). Specifically, we hold that the following requirements should be reviewed de novo: (1) whether an issue is identical to one previously litigated; (2) whether the issue was actually determined; (3) whether it was necessarily decided; and (4) whether the judgment was final and valid. Whether a party had a full and fair opportunity to litigate an issue, however, by definition relates to the fairness of issue preclusion. We do not believe that we can, following Parklane Hosiery Co., review this question de novo. See Blonder-Tongue Lab., Inc. v. University of Illinois Found., 402 U.S. 313, 333-34, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971) (whether a party had a full and fair opportunity to litigate "will necessarily rest on the trial courts' sense of justice and equity"). Instead, following Parklane Hosiery Co., we review the fairness of issue preclusion under an abuse of discretion standard, focusing primarily upon a party's opportunity to litigate the issue. See Swentek, 830 F.2d at 561.
 
 
 29
 The district court never addressed whether issue preclusion was available or applicable. A preliminary question, therefore, is whether we must remand to the district court to determine whether issue preclusion applies. On those issues subject to de novo review (the first four issues discussed below), the fact that the district court has not previously addressed an issue poses no obstacle to our deciding it. See Briscoe v. Levi, 535 F.2d 1259, 1277 (D.C.Cir.1976), vacated on other grounds sub nom. Briscoe v. Bell, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977). On the issue of fairness, however, the lack of district court consideration gives us greater pause. Issues such as fairness that are normally left to the discretion of the district court are best resolved on remand. Nevertheless, we retain the discretion to decide such issues in the first instance where the "proper resolution" is clear "beyond any doubt." Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We now review separately each element of issue preclusion.
 
 1. Actually Determined
 
 30
 The central dispute between the parties is over whether the jury actually determined that the Directors knowingly violated federal securities laws. Because a necessary conclusion drawn from the jury verdict is that the Directors acted in conscious disregard of whether the proxy statement contained misrepresentations, we conclude that the jury found that the Directors knowingly violated Rule 14a-9.
 
 
 31
 Rule 14a-9 prohibits solicitation by means of a proxy statement containing false or misleading statements of material facts. False or misleading statements are misrepresentations. The common law form of action for misrepresentation is an action for deceit. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 107, at 726 (5th ed. 1984). An action brought pursuant to Rule 14a-9 is thus analogous to an action for common law deceit. See VII Louis Loss & Joel Seligman, Securities Regulation 3421-48 (3d ed. 1991) (discussing the interrelationship between common law deceit and SEC antifraud regulations). A tort action for deceit requires proof of scienter, Keeton, supra, at 740, which is satisfied where a party acts with conscious disregard of whether a representation is true.
 
 
 32
 A defendant who asserts a fact as of his own knowledge, or so positively as to imply that he has knowledge, under circumstances where he is aware that he will be so understood when he knows that he does not in fact know what he says is true, is found to have the intent to deceive [scienter], not so much as to the fact itself, but rather as to the extent of his information.
 
 
 33
 Keeton, supra, at 742 (footnotes omitted); see Restatement (Second) of Torts § 526 (1976).[11]
 
 
 34
 In order to find the Directors liable under Rule 14a-9 and § 14(a), the jury had to find that the proxy statement contained material misrepresentations either in the form of affirmative statements or omissions. Under the jury instructions, in order to hold the Directors responsible for these misrepresentations, the jury had to reach one of four alternative conclusions. Specifically, the district court instructed the jury that they had to find either that: (1) the Directors failed to read the proxy statement prior to its transmission to shareholders; (2) they relied on FABI to prepare important portions of the proxy material; (3) they adopted a corporate resolution which falsely stated that they had approved preliminary proxy materials presented at the Directors' meeting on February 12, 1987, when no such materials were presented at that meeting; or (4) they permitted FABI to write the statement of reasons for the merger given in the proxy statement and attribute those reasons sight unseen to the Directors.
 
 
 35
 Each of these conclusions is equivalent to finding that each individual Director asserted a fact as his own knowledge when no director actually knew whether the fact was true. See Keeton, supra, at 742. Such a conclusion is equivalent to a finding of conscious disregard, the scienter requirement for common law deceit. In finding that the Directors violated Rule 14a-9, therefore, the jury found that the Directors acted knowingly because they acted in conscious disregard of whether the proxy statement contained misrepresentations.[12]
 
 2. Identity of Issues
 
 36
 Issue preclusion only applies where "the issues litigated in the first and second actions are in substance the same." Hughes v. Heyl & Patterson, Inc., 647 F.2d 452, 455 (4th Cir.1981). We must determine therefore whether the jury's implicit finding that the Directors acted in conscious disregard of whether the proxy statement contained misrepresentations satisfies the requirement under § 13.1-692.1 of the Virginia Code that violations of federal securities law be knowing.
 
 
 37
 Just as a claim under Rule 14a-9 is comparable to a claim for common law deceit, the "knowing" component of § 13.1-692.1 is comparable to the scienter component for intentional misrepresentation. Scienter is a term of art that, in the context of intentional misrepresentation, refers to the intent to deceive. See Keeton, supra, at 741. Both knowledge that a statement is not true and conscious disregard of whether a statement is true satisfy the scienter requirement. Keeton, supra, at 741-42; Restatement (Second) of Torts § 526.[13] Thus, in construing the jury verdict as a finding that the Directors acted with conscious disregard of whether the proxy statement contained misrepresentations, we also construe it as finding scienter, or an intent to deceive. We believe it would be anomalous to construe the jury verdict as finding that the Directors intended to deceive the minority shareholders and at the same time to find that the Directors did not "knowingly" violate Rule 14a-9 within the meaning of § 13.1-692.1.
 
 
 38
 Our conclusion that conscious disregard satisfies the knowledge component of § 13.1-692.1 finds further support in Virginia cases that interpret the term "knowing." In Gottlieb v. Commonwealth, 126 Va. 807, 101 S.E. 872, 873 (1920), the court held that "knowingly" means "the perception of the facts requisite to constitute the crime." See also Good v. Commonwealth, 155 Va. 996, 154 S.E. 477 (1930) ("[t]he term 'knowingly' imports a knowledge that the facts exist which constitute the act or omission a crime"). Under Gottlieb, the Directors knowingly violated Rule 14a-9 if they "perceived the facts requisite to constitute" a violation of Rule 14a-9. Under the conscious disregard theory, the "facts requisite to constitute" a Rule 14a-9 violation include making representations without having a sufficient foundation to conclude that the representations are true. See Keeton, supra, at 742.
 
 
 39
 We conclude that acting in conscious disregard of whether a representation in a proxy statement is true constitutes a "knowing" violation of Rule 14a-9 under § 13.1-692.1 of the Virginia Code. The requirement that issues be identical for purposes of issue preclusion is therefore satisfied.
 
 3. Necessarily Decided
 
 40
 In order for the determination of an issue to be given preclusive effect, it must have been necessary to a judgment. This requirement "prevent[s] the incidental or collateral determination of a nonessential issue from precluding reconsideration of that issue in later litigation." Mother's Restaurant, Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1571 (Fed.Cir.1983). The requirement "is necessary in the name of procedural fairness, if not due process itself, so that parties to litigation have sufficient notice and incentive to litigate matters in earlier proceedings which may bind them in subsequent matters." Wickham Contracting Co. v. Board of Educ., 715 F.2d 21, 28 (2d Cir.1983).
 
 
 41
 The jury had to make one of the four alternative findings discussed above, supra part II.B.1, in order to conclude that the Directors violated Rule 14a-9. That finding, therefore, was necessary to the jury verdict.[14]4. Finality
 
 
 42
 "[F]or purposes of issue preclusion ..., [a] 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13. Finality is a flexible concept. It "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir.1961) (quoted with approval in Swentek, 830 F.2d at 561), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962); Miller Brewing Co. v. Jos. Schlitz Brewing Co., 605 F.2d 990, 996 (7th Cir.1979), cert. denied, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); Restatement (Second) of Judgments § 13 cmt. g & Reporter's Note. Finality assumes that the parties are not denied the opportunity for appellate review. Where an issue or judgment becomes moot on appeal, giving the original judgment preclusive effect may deny the parties appellate review of the original determination. Compare United States v. Munsingwear, Inc., 340 U.S. 36, 39-40, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950) (holding that an appellate court, to avoid effects of issue preclusion, should vacate judgment below if case becomes moot while appeal was pending), with Cowgill, 832 F.2d at 802 ("When a court of appeals reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the unreversed determinations of the trial court normally continue to work an estoppel.").
 
 
 43
 Both this Court and the Supreme Court discussed and expressly upheld the jury's conclusion that the Directors violated Rule 14a-9; the Supreme Court reversed on other grounds. Thus, the issue has had the benefit of full consideration at both the trial and appellate levels. Sandberg/Weinstein, --- U.S. at ----, 111 S.Ct. at 2757-61. Given this consideration, we see no reason for permitting relitigation of issues that the jury has already determined. Accordingly, we find that the jury verdict is sufficiently firm to be accorded conclusive effect.
 
 5. Fairness
 
 44
 We turn finally to the requirement that issue preclusion be fair. In evaluating fairness, we focus primarily on whether the parties had a full and fair opportunity to litigate. See Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1521 (10th Cir.1990). The Directors urge that they did not have a full opportunity to litigate whether they acted knowingly because they were unable to present all of their evidence at trial. They contend that if knowledge had been at issue, each Director would have been entitled to testify regarding whether he knew that he lacked a basis for making the representations in the proxy statement. The district court did not permit all the Directors to testify because it concluded that the evidence was cumulative.
 
 
 45
 Because the Directors do not say what this additional testimony would have been, they have given us no basis for concluding that issue preclusion is unfair. Moreover, we do not believe that the presentation of further evidence would have given the Directors a fuller or fairer opportunity to litigate. Among the key factual issues at trial was whether the Directors had a basis for making the representations in the proxy statement. Plaintiffs argued that the Directors relied upon FABI to prepare the proxy statement and other important sections of the proxy material; the Directors did not read the proxy statement prior to its transmission to the shareholders; and the Directors approved a corporate resolution that stated they had approved preliminary proxy materials presented at a meeting when no such materials had in fact been presented. Each of these arguments attacked the sufficiency of the Directors' basis for believing that the representations in the proxy statement were true. The Directors had a full opportunity to present evidence contesting each of these arguments.
 
 
 46
 Any additional evidence would have had to show that the Directors did not know they lacked a sufficient basis for making the representations in the proxy statement. In other words, the Directors would have had to argue that they were ignorant of their own responsibilities. The Directors would not likely have offered evidence of their own incompetence when they were striving valiantly to establish their competence. The inability to present additional evidence therefore worked no prejudice.
 
 
 47
 The Directors have offered no challenge to fairness other than the exclusion of evidence. Because they make no proffer of what this evidence might be, we conclude that issue preclusion is fair and that no remand on this issue is required since the "proper resolution is beyond any doubt." Singleton, 428 U.S. at 121, 96 S.Ct. at 2877.
 
 C
 
 48
 For the foregoing reasons, we construe the jury verdict as finding that the Directors knowingly violated § 14(a) and Rule 14a-9 and that those violations render Virginia's statutory limitation on the Directors' liability inapplicable.[15] Because we find that the Weinstein Plaintiffs waived their opportunity to challenge the applicability of the cap, we vacate the district court's judgment and remand for entry of the original, alternative judgment in Weinstein. In Sandberg, the district court shall certify a new class excluding the Weinstein Plaintiffs and the Defendants and enter an uncapped judgment in favor of the class and against the Directors.
 
 III
 
 49
 We next address Plaintiffs' contention that they are entitled to a new trial against Bankshares. Plaintiffs urge that the district court committed reversible error in denying a motion to compel responses to deposition questions and production of documents regarding a meeting held between representatives of the Bank and Bankshares and the corporations' litigation counsel. The district court determined that the attorney-client privilege protected these communications and therefore denied all discovery and excluded all evidence related to the meeting. We agree with Plaintiffs that they have shown good cause under the test outlined in Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), for not allowing the Bank to assert the attorney-client privilege against them. Because we conclude that the district court's order likely prejudiced the outcome of the trial, we reverse the judgment for Bankshares on the claim for breach of fiduciary duties and remand for a new trial. We also hold that notes made by the Bank's general counsel during the meeting are not protected from discovery by the attorney work product doctrine because Bankshares has not shown that they were prepared in anticipation of litigation.
 
 
 50
 * On April 15, 1987, a group of shareholders filed an action in Virginia state court seeking to enjoin the merger of VBI and the Bank. A vote on the merger was scheduled for the April 21, 1987, meeting of the Bank's shareholders. On April 20, 1987, the following individuals met to discuss the challenge to the merger:
 
 
 51
 . The Chairman of the Bank, Milton L. Drewer, and the Executive Vice-President of the Bank.
 
 
 52
 . The Bank's general counsel.
 
 
 53
 . Two attorneys from a firm acting as litigation counsel for the Bank.
 
 
 54
 . Two attorneys from a firm acting as counsel for FABI. One attorney, Robert A. Altman, was also the president of First American Corporation, FABI's parent company.
 
 
 55
 . Two attorneys from a firm acting as counsel for VBI and for the Bank.
 
 
 56
 The affidavits of Mr. Altman and the Bank's general counsel indicate that the April 20 meeting had two purposes: (1) a review of litigation strategies regarding the lawsuit; and (2) a final review of the proposed merger prior to the shareholders' meeting. Justice Kennedy summarized the portion of the April 20 meeting that is directly relevant to the allegation of a breach of Bankshares' fiduciary duties as follows:
 
 
 57
 FABI executive Robert Altman and Bank Chairman Drewer met on the day before the shareholders meeting when the vote was taken. Notes produced by petitioners suggested that Drewer, who had received some shareholder objections to the $42 price, considered postponing the meeting and obtaining independent advice on valuation. Altman persuaded him to go forward without any of these cautionary measures.
 
 
 58
 Sandberg/Weinstein, --- U.S. at ----, 111 S.Ct. at 2772 (Kennedy, J., concurring).
 
 
 59
 The "notes" Justice Kennedy refers to were made by the Bank's general counsel during the April 20 meeting. Defendants inadvertently included these notes in documents produced to Plaintiffs as part of the discovery process in Sandberg.[16] At Bankshares' request, the notes were sealed. Plaintiffs moved to compel (1) answers to deposition questions regarding the April 20 meeting and (2) production of these notes. A magistrate judge granted the motion, but the district court reversed, holding that information relating to the April 20 meeting was entitled to the protection of the attorney-client privilege. Although Plaintiffs previously appealed this privilege ruling to this Court, our ruling in favor of Sandberg on the other issues raised on appeal made consideration of the admissibility of this evidence unnecessary.
 
 B
 
 60
 Although we normally review decisions regarding discovery and admission of evidence under an abuse of discretion standard, we review de novo the legal analysis underlying these decisions. See H & W Indus., Inc. v. Occidental Chem. Corp., 911 F.2d 1118, 1121 (5th Cir.1990); cf. Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir.1984) ("the clearly erroneous rule [does not] protect findings which have been made on the basis of the application of incorrect legal standards"). The circuits appear to disagree upon whether the application of the attorney-client privilege "the issue underlying the district court's decision here" involves legal analysis. The Ninth and Eleventh Circuits have concluded that the application of the privilege presents a mixed question of law and fact that should be reviewed de novo. In re Grand Jury Proceedings 88-9, 899 F.2d 1039, 1042 (11th Cir.1990); Tornay v. United States, 840 F.2d 1424, 1426 (9th Cir.1988). The First Circuit has concluded that the existence of the attorney-client privilege is a factual question reviewed for clear error. United States v. Wilson, 798 F.2d 509, 512 (1st Cir.1986).
 
 
 61
 Determining the applicability of the privilege may require some fact-finding that should be reviewed for clear error. See Pizzeria Uno Corp., 747 F.2d at 1526. The background facts here, however, were largely undisputed. Thus, the determination here primarily involved the application of a legal standard to historical facts, see Pullman-Standard v. Swint, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790-91 n. 19, 72 L.Ed.2d 66 (1982) (defining mixed questions of law and fact), and therefore was a mixed question of law and fact that should be reviewed de novo, Rawl v. United States, 778 F.2d at 1014 & n. 9. Because the district court premised its denial of the motion to compel discovery on the attorney-client privilege, we review the district court's decision de novo.
 
 
 62
 The attorney-client privilege encourages full and frank communication between attorneys and their clients, which in turn supports the "broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Moreover, the privilege applies with equal force where the client is a corporation. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985). The attorney-client privilege is one of the oldest of the confidential privileges known to the common law. It is not, however, an absolute privilege, and is subject to the qualification that any injury which "would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of the litigation." 8 John H. Wigmore, Evidence in Trials at Common Law § 2285, at 527 (McNaughton rev. 1961).
 
 
 63
 [S]ince the privilege impedes the full and free discovery of the truth and is in derogation of the public's right to every person's evidence, it is not favored by the federal courts. Accordingly, the privilege is to be strictly confined within the narrowest possible limits consistent with the logic of its principle.
 
 
 64
 In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir.1984) (footnotes and internal quotations omitted).
 
 
 65
 Plaintiffs contend that the attorney-client privilege protects none of the communications at the April 20 meeting. They urge that the purpose of the meeting was business, not legal advice or legal strategy. See United States v. Hirsch (In re Grand Jury Subpoenas), 803 F.2d 493, 496 (9th Cir.1986) (attorney-client privilege not designed to allow client to conduct his affairs secretly), corrected, 817 F.2d 64 (9th Cir.1987). They also argue that the communications were not confidential because third parties were present: Bankshares' communications with its counsel occurred in the presence of the Bank's representatives; the Bank's communications with its counsel occurred in the presence of Bankshares' counsel. Plaintiffs contend that the adverse relationship of Bankshares and the Bank as buyer and seller outweighs any common interest in preparing for litigation. See United States v. Under Seal (In re Grand Jury Subpoenas), 902 F.2d 244, 248 (4th Cir.1990) (discussing joint defense rule).
 
 
 66
 The relationship between Bankshares and the Bank at the time of the April 20 meeting was indeed complicated. As co-defendants in the pending litigation to stop the merger, they were partners in litigation. Yet because the merger had not yet taken place, they remained business adversaries.[17] We shall assume for purposes of this appeal that legal advice and strategy were discussed at the meeting, that such discussions were sufficient to invoke the attorney-client privilege, and that the parties had common interests sufficient for the privilege to apply. Nevertheless, we find that the Bank, as holder of the privilege, may not assert it against its shareholders because Plaintiffs have shown good cause why they should have access to the communications that occurred at the meeting.
 
 C
 
 67
 A corporation is an inanimate entity, and this complicates application of the attorney-client privilege. The privilege legally belongs to the corporation, but the corporation can only assert it through agents, namely, its officers and directors. Commodity Futures, 471 U.S. at 348, 105 S.Ct. at 1990. The officers and directors must only "exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals." Id. at 349, 105 S.Ct. at 1991; see Adelman v. Conotti Corp., 215 Va. 782, 213 S.E.2d 774, 779 (1975) (holding that both the officers and the directors of a corporation owe fiduciary duties to the shareholders). Where shareholders seek information and the corporation's officers seek to withhold it, however, a conflict arises because the shareholders are the persons for whose benefit the officers and directors are acting. In such a circumstance, we must balance the corporate management's need to manage, and the concomitant ability to seek legal counsel, against the interests of the shareholders for whom they are ultimately acting. Garner v. Wolfinbarger, 430 F.2d at 1101.
 
 
 68
 The leading case addressing this balance is Garner v. Wolfinbarger. In Garner, shareholders brought a derivative class action against the corporation's officers and directors alleging violations of state and federal securities law. The Garner Plaintiffs sought access to the advice corporate counsel had given the corporation regarding the issuance and sale of stock, as well as other communications between the corporation and its counsel. Id. at 1096. The Garner court had to determine whether the attorney-client privilege prevented disclosure of these communications to corporate shareholders. Id. at 1095.
 
 
 69
 In Garner, the court held that the peculiar, protected status of minority shareholders does not automatically entitle them to all corporate secrets; a corporation may still assert the attorney-client privilege against them. Id. at 1103-04. Where the corporation's shareholders charge that the corporation's officers or directors have acted inimically to shareholder interests, however, then the shareholders may show "good cause" why the corporation or its officers should not be permitted to invoke the attorney-client privilege. Id. The Garner court created this exception to the attorney-client privilege to protect the fiduciary relationships involved.[18]
 
 
 70
 The Garner court identified nine non-exclusive factors to analyze in determining whether shareholders have shown good cause:[19]
 
 
 71
 [T]he number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.
 
 
 72
 Id. at 1104.
 
 
 73
 The Garner good faith exception has become accepted doctrine.[20] We believe the Garner analysis provides a sound basis for balancing a corporation's need to communicate confidentially with its attorneys against the shareholders' interests as beneficiaries of a fiduciary relationship. Accordingly, we adopt its holding and rationale.
 
 
 74
 In adopting Garner, we do not minimize a corporation's interest in seeking legal advice through its directors. Society's interest in encouraging people to seek advice from and disclose information to their counsel is certainly present in the corporate context. Nevertheless, the communications at issue in this case are not simply between the Bank's officers and its counsel. They also involve the buyer of the Bank's stock (who happens to be the majority shareholder). With these concerns in mind, we turn to the application of the Garner analysis.
 
 
 75
 Most of the Garner factors require little discussion. Plaintiffs' good faith is not in doubt. Given that Plaintiffs have already prevailed on their claim against the Directors, their claim against Bankshares is clearly "colorable." The evidence sought is not available from other sources. Plaintiffs have alleged illegal, albeit not criminal, action: breach of fiduciary duties. The shareholders are not blindly fishing, since the inadvertent disclosure of the notes gave them good reason to seek access to the communications. Trade secrets or other information in which the Bank has a special interest in confidentiality are not at stake. Thus, the second, third, fourth, fifth, eighth, and ninth Garner factors clearly weigh in favor of finding good cause.
 
 
 76
 If Sandberg were the only shareholder in this action, then the first Garner factor, "the number of shareholders and the percentage of stock they represent," id. at 1104, might weigh against her. See Ward v. Succession of Freeman, 854 F.2d 780, 786 (5th Cir.1988) (fact that Plaintiffs owned less than four percent of stock weighed against finding good cause), cert. denied, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989). We review this factor, however, in light of our earlier determination that the district court erred in denying class certification. Because the class of shareholders controlled fifteen percent of the stock, we find that this factor weighs in favor of finding good cause as well.
 
 
 77
 The sixth and seventh Garner factors, "whether the communication related to past or to prospective actions" and "whether the communication is of advice concerning the litigation itself," require more extensive discussion. Integral to our analysis of both factors is the fact that the April 20 meeting had two purposes: review of litigation strategy and final review of the proposed merger.
 
 
 78
 Bankshares argues that the good cause exception does not apply because the communications at the April 20 meeting involve legal advice sought by management in defending against a suit brought by shareholders. If a corporation cannot assert the attorney-client privilege to protect such communications, Bankshares urges, then a corporation and its directors could never effectively defend themselves in legal proceedings commenced by shareholders since they could not obtain confidential legal advice. If the sole purpose of the April 20 meeting were consultation regarding legal strategies in the state court proceedings, then this argument might persuade us. Yet the April 20 meeting had a second purpose.
 
 
 79
 As the affidavits of Altman and the Bank's general counsel clearly indicate, one purpose of the April 20 meeting was to review the merger prior to the annual shareholders' meeting the next day. The merger was not complete until after final approval at the shareholders' meeting, and the Bank could have postponed the meeting to protect the minority shareholders' interests. If preparation for the shareholders' meeting had been the sole purpose of the April 20 meeting, then the seventh factor in the Garner analysis clearly weighs in Plaintiffs' favor. Because of the dual nature of the meeting, however, this factor is inconclusive.
 
 
 80
 The sixth factor, which addresses whether the communications involved past or prospective actions, is problematic. The Garner court did not indicate which type of communication deserved greater protection, those concerning past or those concerning prospective actions. At least one court has concluded that communications related to prospective actions deserve more protection. Ohio-Sealy Mattress Mfg. Co. v. Kaplan, 90 F.R.D. 21, 31 (N.D.Ill.1980). In discussing the past prospective distinction, however, the Ohio Sealy Mattress Mfg. Co. court combined its analysis with a discussion of whether the communications concern the litigation itself, the seventh Garner factor discussed above. See id.
 
 
 81
 We believe the past/prospective distinction addresses a different problem than the seventh Garner factor. In devising the good cause standard, the Garner court drew an analogy between good cause and the crime/fraud exception to the attorney-client privilege. 430 F.2d at 1102-03. Under the crime/fraud exception, communications with an attorney for the purpose of perpetrating or facilitating a crime or fraud in the future are not privileged. United States v. Under Seal (In re Grand Jury Subpoena), 884 F.2d 124, 127 (4th Cir.1989). In such a context, the societal interests in preventing crime and fraud outweigh the confidentiality between a client and his attorney. United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989). Communications seeking legal advice regarding past crimes or fraud are, however, privileged. See id. at 562-63, 109 S.Ct. at 2626.
 
 
 82
 The past/prospective distinction in this case is analogous to the past and prospective portion of the crime/fraud exception. This case is not a criminal action and the civil lawsuit does not expressly state a cause of action for fraud. Nevertheless, the improprieties, breaches of fiduciary duties, and violations of securities laws alleged (and proved) by Plaintiffs encompass conduct of a magnitude that should be accorded significant weight in the balance between society's interests in enforcing fiduciary duties and the corporation's interest in confidential communications with its attorney.
 
 
 83
 If the Bank's officers were simply meeting with the Bank's counsel after the annual shareholders' meeting to discuss the legal ramifications of past decisions about the merger, the evidence would not support finding good cause. This was not the case. The Bank's officers and directors could still have taken action to protect the minority shareholders' interests. Indeed, they had a continuing fiduciary obligation to do so. Because the prospective aspect of the April 20 meeting--the preparation for the shareholders' meeting--is strongly related to the breach of fiduciary duties at issue, this factor supports finding good cause.
 
 
 84
 The factors identified in Garner weigh strongly in favor of finding good cause. Other considerations similarly favor finding good cause. The shareholders' interest is particularly strong where "an executive's communications have been with counsel for a party whose interests are potentially adverse to those of the executive's shareholders." Bailey v. Meister Brau, Inc., 55 F.R.D. 211, 214 (N.D.Ill.1972). In this case, the communications between the Bank's officers and its counsel took place in a meeting with representatives of and counsel for Bankshares. As purchaser of the Bank's stock, Bankshares' interests were actually, not just potentially, adverse to those of the minority shareholders. We find this fact particularly persuasive in our finding of good cause in this case.
 
 
 85
 A corporation's officers and directors "cannot turn [their] responsibilities on and off like a faucet." Id. As one court applying the Garner exception explained: "A fiduciary owes the obligation to his beneficiaries to go about his duties without obscuring his reasons from the legitimate inquiries of the beneficiaries." Valente v. Pepsico, Inc., 68 F.R.D. 361, 370 (D.Del.1975). The Plaintiffs have a significant interest in knowing what factors, including legal advice, contributed to the Directors' decision not to postpone the annual shareholders' meeting to obtain an additional evaluation. They have a particular interest in discovering whether the majority shareholder, Bankshares, influenced this decision.
 
 
 86
 We believe the attorney/client privilege should not be used to shield the communications at the April 20 meeting from discovery by the very persons for whom the meeting participants were acting as fiduciaries. In this case, the shareholders' interest in obtaining information regarding the role of Bankshares in this merger outweighs the policy concerns supporting the attorney-client privilege. We find that the class of minority shareholders has shown good cause not to allow the attorney-client privilege to be invoked in this case.
 
 D
 
 87
 Because we find that the attorney-client privilege does not protect the communications at the April 20 meeting, we must address whether the district court's error in denying Plaintiffs' motion to compel was harmless. Fed.R.Civ.P. 61.
 
 
 88
 The minority shareholders did not prevail at trial on their claim that Bankshares had breached its fiduciary duties as controlling majority shareholder. Bankshares strenuously argued to the jury that the Bank had determined on its own not to obtain an independent valuation of the minority stock and that Bankshares had in no way meddled in the Bank's deliberations, pressured the Bank to speed up the process, or otherwise affected the Board's decision. (J.A. at 664, 666, 667, & 676). In addition, Altman repeatedly testified that obtaining an independent valuation of the stock was a matter "for the [Bank's] board to consider." (J.A. 548-49, 551).
 
 
 89
 By precluding discovery of the communications at the April 20 meeting, particularly Altman's comments to Drewer, the district court prevented Plaintiffs from combatting this defense by offering contrary proof that could have been very persuasive to the jury. Where the excluded evidence is highly relevant and we cannot be certain that its absence did not prejudice the outcome, the error is not harmless. Ellis v. International Playtex Inc., 745 F.2d 292, 305 (4th Cir.1984); see also MCI Telecommunications Corp. v. Wanzer, 897 F.2d 703, 706 (4th Cir.1990). Because we cannot say that the district court's error was harmless, we find that a new trial is warranted. See Friendship Heights Assocs. v. Koubek, 785 F.2d 1154, 1160 (4th Cir.1986).
 
 E
 
 90
 Bankshares argues that the notes taken by the Bank's general counsel at the April 20 meeting constitute attorney work product and as such are not discoverable. In Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court first recognized the concept of attorney work product. The Court stated that "[i]n performing his various duties ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," id. at 510, 67 S.Ct. at 393, and that "[p]roper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference," id. at 511, 67 S.Ct. at 393. The Supreme Court also expressed its concern that, if it permitted discovery of the material sought, then "much of what is now put down in writing would remain unwritten." Id. Federal Rule of Civil Procedure 26(b)(3)[21] codified Hickman and its progeny. See Doe v. United States (In re Doe), 662 F.2d 1073, 1078 (4th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982).
 
 
 91
 Determining whether work product immunity is available requires a three step analysis. First, we must determine whether the work product was made "in anticipation of litigation." If not, then the inquiry ends because the material is not protected. If the material was prepared in anticipation of litigation, then we must determine whether the material is "opinion work product" or "non-opinion work product." Opinion work product prepared in anticipation of litigation is absolutely immune from discovery. Finally, if the material is nonopinion work product, then it may be discovered upon a showing of "substantial need." See National Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980, 983-84 (4th Cir.1992).[22]
 
 
 92
 The burden of proof rests with Bankshares, the party asserting the work product doctrine, to demonstrate that the notes were prepared in anticipation of litigation. Binks Mfg. Co. v. National Presto Indus., 709 F.2d 1109, 1118 (7th Cir.1983); Pete Rinaldi's Fast Foods, Inc. v. Great American Ins. Cos., 123 F.R.D. 198, 201 (M.D.N.C.1988). In National Union Fire Ins. Co., we recognized that the "anticipation of litigation" criterion is difficult to apply because "litigation is an ever-present possibility in American life." Id. at 984. In attempting to give further guidance on this issue, we stated that "[t]he document must be prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." Id. On the other hand, "materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes" are not prepared in anticipation of litigation. Id.
 
 
 93
 Bankshares has not shown that the Bank's general counsel prepared the notes in anticipation of litigation rather than in the "ordinary course of business." Although the general counsel's affidavit indicates the purposes of the April 20 meeting, it does not indicate her purpose in making the notes. The mere fact that a lawsuit was pending does not transform an attorney's notes into material prepared in anticipation of litigation. Moreover, while a general counsel may be involved in litigation strategy and oversight, it is also possible that her involvement in the litigation is no different from that of other corporate officers. In either case, her purpose in taking the notes is not self-evident and we find that Bankshares has failed to satisfy its burden of proof on this issue. Therefore, the work product doctrine will not protect from discovery the notes made at the April 20 meeting.[23]
 
 F
 
 94
 In summary, we grant Plaintiffs a new trial on their claim that Bankshares breached its fiduciary duties. The attorney-client privilege will not bar Plaintiffs from posing questions or seeking testimony regarding the discussions at the April 20 meeting, and the general counsel's notes from the meeting will not be protected from discovery under the attorney work product doctrine.
 
 IV
 
 95
 We vacate the district court's judgment and remand. On remand, the district court shall: (1) enter judgment in Weinstein in the amount of the original alternative judgment; (2) certify a new class that excludes the Weinstein Plaintiffs and the Defendants; and (3) enter an uncapped judgment for the new class on their claim against the Directors for breach of fiduciary duties. We reverse the district court's denial of a new trial on Plaintiffs' claim against Bankshares for breach of fiduciary duties and remand for further proceedings consistent with this opinion.
 
 
 96
 VACATED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 At various points in this opinion, we distinguish between the original plaintiffs in Sandberg (the Sandberg Plaintiffs) and in Weinstein (the Weinstein Plaintiffs). We refer to both groups together as "Plaintiffs."
 
 
 [2]
 Section 14(a) was last amended in 1964. It prohibits the solicitation of proxies in a manner inconsistent with SEC regulations
 
 
 [3]
 Rule 14a-9 was last amended in 1979. It prohibits solicitation by means of a proxy statement containing a false or misleading statement of material fact
 
 
 [4]
 The Directors owed fiduciary duties as directors of the Bank. Adelman v. Conotti Corp., 215 Va. 782, 213 S.E.2d 774, 779 (1975). Bankshares owed fiduciary duties as majority shareholder. Mardel Sec., Inc. v. Alexandria Gazette Corp., 320 F.2d 890, 894 (4th Cir.1963)
 
 
 [5]
 The district court entered an "alternative judgment" in order to avoid double recovery. An "alternative judgment" is generally understood to be one that a party may satisfy by doing one of several alternative acts. 47 Am.Jur.2d Judgments § 1052 (1969); Black's Law Dictionary 842 (6th ed. 1990). The district court's final order is better characterized as a judgment based on alternative theories of liability. See Washburn v. Kansas City Life Ins. Co., 831 F.2d 1404, 1410-11 (8th Cir.1987). This characterization avoids the impression that the parties in Sandberg appealed from two judgments. Nevertheless, we will follow the "alternative judgment" terminology employed by the district court both in Sandberg and later in Weinstein
 
 
 [6]
 The Weinstein Plaintiffs contend that this Court's mandate in the first appeal obligated the district court to certify a class that did not include them and enter a separate judgment in Weinstein for the amount of the original alternative judgment, $2,346,553.34. This Court's mandate, however, was not binding as the law of the case to the extent that it was reversed or undermined by the Supreme Court's subsequent decision. See United States v. Simmons, 923 F.2d 934, 956 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2018, 114 L.Ed.2d 104 and cert. denied, --- U.S. ----, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991)
 The district court determined that the mandate must be reconsidered because: (1) the federal securities law claim had been reversed; (2) the cap did not apply separately to Weinstein and Sandberg; and (3) the cap did limit Plaintiffs' recovery. While we disagree in part with the district court's conclusion that the cap limited Plaintiffs' recovery, see infra part II.C, we cannot fault its decision to reconsider our mandate in light of the Supreme Court's judgment. Indeed, reconsideration was the purpose for our remand following the Supreme Court's reversal.
 
 
 [7]
 Plaintiffs also appeal the district court's denial of two other motions. First, Plaintiffs moved to conform the pleadings to the evidence and enter a judgment against Bankshares on the theory that Plaintiffs had proved at trial that one of the directors of VBI, Jack W. Beddow, had a conflict of interest, and thus that VBI owed Plaintiffs restitution. We agree with the district court that Plaintiffs waived this theory of liability by not presenting it earlier. See Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc., 974 F.2d 502, 505 (4th Cir.1992)
 Second, Plaintiffs moved for a new trial on the ground that newly discovered evidence showed that one of FABI's directors and key witnesses, Clark Clifford, had a previously undisclosed ownership interest in FABI. Because we reverse the district court's denial of a new trial on the basis of erroneously excluded evidence, see infra part III.D, we do not address this issue.
 
 
 [8]
 Because the cap is a creature of Virginia law, it did not limit Plaintiffs' recovery on their federal securities law claim
 
 
 [9]
 "Prior litigation" can include previous stages of the same litigation. An example is the binding effect of a jury verdict upon a judge's subsequent equitable rulings. 18 Charles A. Wright et al., Federal Practice and Procedure § 4418, at 174 (1981); see Williams v. Cerberonics, Inc., 871 F.2d 452, 458 n. 4 (4th Cir.1989)
 
 
 [10]
 In the present context, where Plaintiffs assert that an issue was resolved during an earlier stage of the same litigation, issue preclusion bears a close resemblance to the doctrine of law of the case. See Cowgill v. Raymark Indus., Inc., 832 F.2d 798, 802 (3d Cir.1987). The major difference is that law of the case only applies to legal questions. See Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). Issue preclusion, in contrast, can foreclose relitigating factual questions
 
 
 [11]
 In drawing this analogy, we do not imply that scienter is necessary to finding liability under § 14(a) and Rule 14a-9, an issue that we have not addressed and that the Supreme Court has expressly reserved. Sandberg/Weinstein, --- U.S. at ---- n. 5, 111 S.Ct. at 2757 n. 5
 
 
 [12]
 The Supreme Court in this case addressed whether statements of "reasons, opinion or belief" are actionable under Rule 14a-9 and § 14(a). In so doing, the Supreme Court determined that such statements by definition are knowing statements, and interpreted the jury verdict as finding a knowing violation of § 14(a). Sandberg/Weinstein, --- U.S. at ----, 111 S.Ct. at 2757. As a result, the Court did not address whether liability under § 14(a) could be found in the absence of scienter. The Court's discussion, however, was expressly limited to statements of "reasons, opinion or belief," and does not apply to the other misrepresentations in this case. See Sandberg/Weinstein, 891 F.2d at 1121-22 & n. 3 (discussion of the representations in this case)
 
 
 [13]
 We have not found any Virginia cases addressing whether conscious disregard satisfies the scienter requirement for intentional misrepresentation. The conscious disregard scienter theory, however, originated in Derry v. Peek, 14 App.Cas. 337, 374 (H.L.1889), the English case that first required scienter in an action for intentional misrepresentation. Keeton, supra, at 740. Given this pedigree and the general acceptance of the theory, see Restatement (Second) of Torts § 526, we have no doubt that Virginia would recognize the theory
 
 
 [14]
 An argument could be made that because the Supreme Court reversed on the federal claim, the jury verdict should not preclude relitigating those findings necessary to the federal claim but not necessary to the state claim. Thus, while the jury had to conclude that the Directors violated Rule 14a-9 in order to find liability under federal law, this conclusion was not necessary to their finding of liability under state law, and thus arguably does not satisfy the necessity requirement. We reject this argument. The necessity requirement insures that an issue has been fully considered in the original proceeding. In the present case, the jury fully considered the issue. See Ritter v. Mount St. Mary's College, 814 F.2d 986, 993-94 (4th Cir.) (rejecting similar argument), cert. denied, 484 U.S. 913, 108 S.Ct. 260, 98 L.Ed.2d 217 (1987)
 
 
 [15]
 Plaintiffs also argued that the opening language of § 13.1-692.1, "[i]n any proceeding," indicated that the damage cap should apply separately to individual cases. Based on this interpretation, they urged us to separate the Weinstein Plaintiffs from the remainder of the class and apply the cap separately to the original Weinstein and Sandberg judgments. Because we conclude that the cap should apply separately to Weinstein for different reasons (namely that the cap does not apply in Sandberg ), we do not address this argument
 
 
 [16]
 Plaintiffs argue that this inadvertent production of the notes destroyed the confidentiality necessary for application of the attorney-client privilege. See In re Sealed Case, 877 F.2d 976, 980 (D.C.Cir.1989); International Digital Sys. Corp. v. Digital Equip. Corp., 120 F.R.D. 445, 450 (D.Mass.1988). Bankshares argues that it took "reasonable steps to insure and maintain" the confidentiality of the notes. In re Grand Jury Proceedings, 727 F.2d 1352, 1356 (4th Cir.1984) (recognizing that reasonable precautions are necessary to preserve the privilege, although not holding that such precautions are sufficient to preserve it); see also Transamerica Computer Co. v. International Business Machs. Corp., 573 F.2d 646, 651 (9th Cir.1978) (holding that privilege was not waived where rigorous discovery schedule prevented party from asserting it). Bankshares also points out that the notes were prominently labeled "privileged," and urges that Plaintiffs not benefit from ignoring the label
 In and of itself, the mere labeling of a document "privileged" certainly does not require application of the attorney-client privilege. Attorneys are responsible for taking substantial steps to preserve client confidences. In addition, we do not believe that the protection of the attorney-client privilege should turn on whether an attorney should or should not have read the document. Attorneys can reasonably be expected to read documents produced in response to a discovery request. Certainly no judicial order can require an attorney to forget what he has already read. See Federal Deposit Ins. Corp. v. Marine Midland Realty Credit Corp., 138 F.R.D. 479, 483 (E.D.Va.1991). Despite our concerns, we do not address whether inadvertent disclosure waived the privilege because we hold for other reasons that the attorney-client privilege should not be applied in this context.
 
 
 [17]
 See Va.Code Ann. § 13.1-718(J) (Michie Supp.1992) (merger may be abandoned any time prior to effective date of certificate of merger unless merger plan requires shareholders' approval to abandon merger)
 
 
 [18]
 The Garner exception has been criticized as unnecessary because other well-established doctrines are available to limit the breadth of the attorney-client privilege. Stephen A. Salzburg, Corporate Attorney-Client Privilege in Shareholder Litigation and Similar Cases: Garner Revisited, 12 Hofstra L.Rev. 817 (1984). Professor Salzburg argues that the attorney-client privilege belongs to the corporation and the corporation can freely waive it, even if such waiver disadvantages the officers of the corporation. Yet even Professor Salzburg acknowledges that "a majority of shareholders and their chosen surrogates could take unfair advantage of a minority by controlling the privilege and avoiding waiver." Id. at 835. We find the Garner exception necessary because this case presents precisely the situation he describes
 
 
 [19]
 Indeed, we recently acknowledged the competing interests in applying the attorney-client privilege in the context of a fiduciary relationship and advocated the Garner court's good cause approach to balancing. See Fortson v. Winstead, McGuire, Sechrest & Minick, 961 F.2d 469, 475-76 n. 5 (4th Cir.1992)
 
 
 [20]
 See Fausek v. White, 965 F.2d 126, 130 (6th Cir.1992) (adopting Garner ); Gerrits v. Brannen Banks, Inc., 138 F.R.D. 574, 579 (D.Colo.1991) (applying Garner good cause factors to a case involving derivative and non-derivative claims but finding an insufficient showing of a breach of fiduciary duties to warrant application of the exception); Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 68-69 (D.N.J.1990) (looking to Garner as guidance on the suitability of the attorney-client privilege in a situation where common interests are involved); In re Sunrise Sec. Litig., 130 F.R.D. 560, 597 (E.D.Pa.1989) (adopting the analysis of Garner and Valente v. Pepsico, Inc., 68 F.R.D. 361 (D.Del.1975) as controlling); Margaret Hall Found., Inc. v. Strong (In re Atlantic Fin. Management Sec. Litig.), 121 F.R.D. 141, 146 (D.Mass.1988) (discussing Garner but concluding that no fiduciary relationship existed); Aguinaga v. John Morrell & Co., 112 F.R.D. 671 (D.Kan.1986) (applying Garner fiduciary duty exception in the context of a labor union and the employees it represented); Helt v. Metropolitan Dist. Comm'n, 113 F.R.D. 7, 9-10 (D.Conn.1986) (applying Garner exception to ERISA fiduciaries); In re Dayco Corp. Derivative Sec. Litig., 99 F.R.D. 616, 620 (S.D.Ohio 1983) (concluding that Garner was the correct interpretation of the law and should be applied); Quintel Corp., N.V. v. Citibank, N.A., 567 F.Supp. 1357, 1363 (S.D.N.Y.1983) (applying Garner when fiduciary relationship existed); Donovan v. Fitzsimmons, 90 F.R.D. 583, 586 (N.D.Ill.1981) (finding the Garner approach well-reasoned and an adequate balance between public interest in the confidentiality of the information and the interests of the beneficiaries of corporate fiduciaries); Cohen v. Uniroyal, Inc., 80 F.R.D. 480, 482 (E.D.Pa.1978) (applying Garner and finding good cause); Valente v. Pepsico, Inc., 68 F.R.D. 361, 367 (D.Del.1975) (applying Garner and finding that the corporation did not show good cause why the exception should not apply). But see Weil v. Investment/Indicators, Research & Management, Inc., 647 F.2d 18, 23 (9th Cir.1981) (without passing on the merits of Garner, holding that it was not applicable in a nonderivative claim brought by a past shareholder); Shirvani v. Capital Investing Corp., 112 F.R.D. 389, 390 (D.Conn.1986) (declining to apply Garner good cause factors finding them to be ill-defined and unnecessary)
 
 
 [21]
 Rule 26(b)(3) provides in part:
 Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering the discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
 
 
 [22]
 As with the attorney-client privilege, the work product doctrine applies where the client is a corporation. Duffy v. United States (In re Grand Jury Proceedings), 473 F.2d 840, 842 (8th Cir.1973). The Garner exception discussed above, however, does not apply to the work product doctrine. Koenig v. International Sys. & Controls Corp. Sec. Litig. (In re International Sys. & Controls Corp. Sec. Litig.), 693 F.2d 1235, 1239 (5th Cir.1982). Moreover, although work product immunity may be waived, an "inadvertent or partial disclosure in response to specific inquiries" does not result in waiver. Duplan Corp. v. Deering Milliken, Inc., 540 F.2d 1215, 1223 (4th Cir.1976)
 
 
 [23]
 Because we find that Bankshares has failed to prove that the notes were made by the general counsel in anticipation of litigation, we need not address whether the notes are opinion work product. We do note, however, if we found they were not opinion work product, there is an abundance of evidence in this record to support a showing of "substantial need."