In re HOFFMAN ASSOCIATES, INC., d/b/a Hoffman Drywall, Inc. and Hoffman Associates, Inc., Debtor.

W. Ryan HOVIS, Trustee, Plaintiff,

v.

POWERS CONSTRUCTION COMPANY, INC., Wilbur O. Powers and South Carolina National Bank, Defendants.

Bankruptcy No. 90–02419.
Adv. No. 91–8293.

United States Bankruptcy Court,
D. South Carolina.

April 24, 1995.

Garland S. Cassada, Charlotte, NC, for W. Ryan Hovis.

Michael S. Church, Columbia, SC, for Powers Construction Company.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court for trial upon the Complaint, as amended, filed by the Plaintiff, W. Ryan Hovis, the Chapter 7 Trustee for the Debtor ("Trustee") asserting twelve causes of actions against the various defendants. The Trustee seeks recovery of allegedly preferential payments from Defendant Powers Construction Company, Inc. (hereinafter "Powers Construction") in the first cause of action, from Defendant South Carolina National Bank (hereinafter "SCN") in the second cause of action, and Defendant Wilbur O. Powers (hereinafter "Powers" or "Wilbur Powers") in the third cause of action. The Trustee in the fourth and fifth causes of action seeks recovery pursuant to 11 U.S.C. § 548[1], and under S.C.Code § 27–23–10 for the sixth

cause of action, of amounts alleged to have been fraudulently transferred to Powers Construction.[2] The seventh cause of action alleges a right to recover from Wilbur Powers amounts claimed to have been paid as unlawful dividends. The Trustee in the eighth cause of action asserts a right to pierce the Debtor's corporate veil and recover on behalf of creditors from Wilbur Powers and Powers Construction. The ninth cause of action seeks a determination that the claim of Powers Construction should be subordinated to the claims of other creditors of the Debtor. The tenth cause of action has been stipulated to by the parties and the remaining two causes of action have been previously disposed of by Orders of this Court.

Based upon the evidence presented in the form of stipulated facts, documentary exhibits, the testimony of three witnesses, transcripts and exhibits from a 2004 examination and from an earlier proceeding on a motion for relief from stay filed on behalf of Powers Construction, and by taking judicial notice of all records of this Court in this bankruptcy proceeding including the previous Orders of this Court including an appeal to the District Court and Circuit Court of Appeals for the Fourth Circuit, this Court makes the following Findings of Fact and Conclusions of Law:

### *FINDINGS OF FACT*

1. In 1984, Defendant Wilbur Powers and Mr. Bobby Hoffman ("Mr. Hoffman") formed the Debtor, Hoffman Associates, Inc. (the "Debtor" or "Hoffman Associates") for the purpose of working as a subcontractor in the construction business. Wilbur Powers and Mr. Hoffman each owned fifty percent of the Debtor's common stock.

2. Prior to April 1989, Mr. Hoffman was the President of the Debtor and managed its day-to-day operations. Wilbur Powers was the Secretary and Treasurer. Both Wilbur

---

**1.** Further reference to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, shall be by section number only.

**2.** The Sixth Cause of Action will be discussed in Paragraph V of the Conclusions of Law with the

discussion of the Fourth Cause of Action and will also be discussed in Paragraph VI of the Conclusions of Law as it related to the Fifth Cause of Action.

Powers and Mr. Hoffman were directors of the Debtor.

3. On December 21, 1987, the Debtor executed an unsecured $150,000.00 note to refinance a working capital line of credit with SCN. ("Note # 9008").

4. Note # 9008 was personally guaranteed by Bobby Hoffman and Defendant Wilbur Powers.

5. The repayment terms of Note # 9008 were 36 payments of four thousand ($4,000.00) dollars, plus interest calculated at the SCN prime rate plus one percentage point.

6. Payments on Note # 9008 began as scheduled. The Debtor made the following payments on the note obligation during the year preceding the filing of the involuntary bankruptcy petition:

| Payment Date | Check Number | Amount |
|---|---|---|
| 09/29/89 | customer debit [3] | $19,280.64 |
| 11/27/89 | 011662 | $ 4,638.25 |

7. Beginning as early as October of 1987, Powers Construction and the Debtor engaged in a course of transactions whereby Powers Construction would on each banking day determine the total amount of the checks being presented for payment from the Debtor's account at SCN and the balance of funds contained in said account. If the amount in the Debtor's account was insufficient to cover the checks being presented for payment, Powers Construction would direct SCN to advance an amount sufficient to cover the checks from the Powers Construction account at SCN. If the account balance was in excess of that necessary to pay the checks being presented for payment, all but a nominal amount of the funds would be transferred from the Debtor's account to the Powers Construction account.

8. From July 17, 1989 through June 1, 1990, transfers between the Debtor and Powers Construction occurred as follows:

| Date | Transfers from Debtor to Powers Construction | Transfers from Powers Construction to Debtor |
|---|---|---|
| 07–17–89 | 25,000.00 | |
| 07–21–89 | 10,000.00 | |
| 07–24–89 | | 15,000.00 |
| 07–28–89 | | 10,000.00 |
| 08–02–89 | | 2,000.00 |
| 08–04–89 | | 6,000.00 |
| 08–09–89 | | 8,000.00 |
| 08–10–89 | 10,000.00 | |
| 08–11–89 | | 10,000.00 |
| 08–17–89 | | 1,000.00 |
| 08–18–89 | | 4,000.00 |
| 08–21–89 | | 5,000.00 |
| 08–24–89 | | 5,000.00 |
| 08–28–89 | | 6,000.00 |
| 08–30–89 | 5,000.00 | |
| 09–07–89 | | 10,000.00 |
| 09–11–89 | | 5,000.00 |
| 09–12–89 | | 28,000.00 |
| 09–15–89 | | 5,000.00 |
| 09–19–89 | 6,000.00 | . |
| 09–21–89 | 60,000.00 | |
| 09–25–89 | | 5,000.00 |
| 09–28–89 | | 19,500.00 |
| 10–02–89 | | 4,000.00 |
| 10–03–89 | 10,000.00 | |
| 10–04–89 | 15,000.00 | |
| 10–10–89 | | 1,000.00 |
| 10–11–89 | | 7,000.00 |
| 10–19–89 | 5,000.00 | |
| 10–20–89 | | 11,000.00 |
| 11–13–89 | 4,000.00 | |
| 11–21–89 | 2,000.00 | |
| 11–27–89 | | 4,000.00 |
| 11–28–89 | | 5,000.00 |
| 12–18–89 | | 7,000.00 |
| 01–01–90 | | 9,241.36 |
| 01–11–90 | 13,000.00 | |
| 01–24–90 | 5,000.00 | |
| 01–29–90 | 16,000.00 | |
| 02–01–90 | | 9,050.42 |
| 02–01–90 | 41,000.00 | |
| 02–05–90 | 32,000.00 | |
| 02–08–90 | | 3,200.00 |
| 02–09–90 | | 21,000.00 |
| 02–13–90 | | 500.00 |
| 03–01–90 | | 4,000.00 |
| 03–05–90 | 29,000.00 | |
| 03–07–90 | 8,000.00 | |
| 03–19–90 | 1,000.00 | |
| 03–21–90 | 3,000.00 | |
| 03–23–90 | | 10,000.00 |
| 04–01–90 | | 4,825.61 |
| 04–02–90 | 14,000.00 | |
| 04–06–90 | | 1,500.00 |
| 04–25–90 | 9,500.00 | |
| 05–01–90 | | 4,358.72 |
| 05–10–90 | | 7,460.00 |
| 06–01–90 | | 4,311.67 |
| **TOTALS** | $323,500.00 | $262,947.78 |

9. Powers Construction maintained a business relationship with numerous other business entities in which Wilbur Powers had an interest on identical terms as the relationship maintained with Hoffman Associates.

10. In April 1989, Mr. Hoffman died. At the time of Mr. Hoffman's death, Defendant Powers Construction held a substantial unsecured claim against the Debtor, and Defendant Wilbur Powers was a personal guarantor of several unsecured claims against the Debtor owed to Defendant SCN. After the

3. A customer debit is an internal bank debit to a checking account. The debit reflects the account number debited (Account Number 180066581) in the name of "Hoffman & Associates, Inc."

death of Mr. Hoffman, in or about May 1989, John Rabun, an employee of Powers Construction, took control over the operations of the Debtor.

11. On June 25, 1989, one year prior to the filing of the petition initiating the Chapter 7 proceeding involving Hoffman Associates, the Debtor had eight uncompleted construction contracts in varying stages of completion.

12. On June 22, 1989, Wilbur Powers executed on behalf of the Debtor a promissory note (the "Note") payable to Powers Construction in the principal amount of $404,175.13 to evidence the amount of an antecedent debt owed to Powers Construction by the Debtor on that day. Wilbur Powers also signed a security agreement (the "Security Agreement") purporting to grant Powers Construction a security interest in all of the Debtor's property to secure the antecedent debt and future advances to be made by Powers Construction.

13. On July 6, 1989, August 24, 1989, and October 20, 1989, Powers Construction received payments from the Debtor totalling $8,000.00, identified as "management fees."

14. As stipulated by the parties, Wilbur Powers and Powers Construction are insider creditors of the Debtor in this case as that term is defined by §§ 101(2) and (31).

15. The Debtor's tax returns reflect liabilities in excess of assets for the fiscal year ending September 30, 1989.

16. On June 25, 1990, an involuntary Chapter 7 bankruptcy petition was filed against Hoffman Associates. An Order for Relief was entered on August 8, 1990 adjudicating Hoffman Associates to be a debtor under Chapter 7.

17. As of the date of the petition, the Debtor had on deposit with SCN the sum of $1,037.72. These funds, as well as other funds deposited with SCN, were turned over to the Plaintiff Trustee subject to the terms of the Court's January 6, 1993 Order.

18. Subsequent to June 25, 1990, the Debtor made transfers to Powers Construction in an amount totalling $39,137.76.

19. On July 31, 1991, this Court issued a judgment finding that the Powers Construction Note and Security Agreement were void, and after the exhaustion of appellate review, that judgment is final.

## CONCLUSIONS OF LAW

### I. Preliminary Issues As to Collateral Estoppel

As noted, Defendant Powers Construction Company, Inc., has previously pursued a motion for relief from stay in which it asserted a security interest in essentially all of the Debtor's assets, including the sums which are the subject of the Trustee's claims in the current adversary proceeding. This Court, after extensive review of the business and financial relationships between Wilbur Powers, Powers Construction and the Debtor, denied the requested relief and found that the note and security agreement asserted by Powers Construction Company were void. That Order was appealed by Powers Construction. The District Court and the Fourth Circuit Court of Appeals affirmed this Court and the Orders are now final. Thus, as a preliminary matter, the Court must first address the question of the effect of that prior litigation on the issues presented in the present litigation.

The findings and rulings of this Court, as well as those of the District Court and the Fourth Circuit, are the law of the case. "Law of the case rules developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478 (West 1981). Under this doctrine, "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on later appeal." *Dorsey v. Continental Cas. Co.,* 730 F.2d 675, 678 (11th Cir.1984).

The question of the effect of prior judgments on subsequent proceedings is governed by the principles of res judicata and collateral estoppel. Res judicata is generally recognized as applying to preclude the relitigation of the same claim between parties

in a subsequent action while collateral estoppel, or issue preclusion, on the other hand, "forecloses the 're-litigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate.'" *Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 343 (4th Cir.1992). In the prior litigation, Powers Construction asserted an indebtedness owed by the Debtor which arose out of the companies business and financial relationship and which included the validity of, and Powers Constructions' right to foreclose, a security interest in the Debtor's property.

■ As recognized in *Sandberg*, there are several prerequisites to the application of collateral estoppel to any issue. First, the issue at stake in this litigation must be identical to an issue actually decided in the prior litigation. Second, determination of the issue must have been a critical and necessary part of judgment in the earlier action. Third, the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. Application of these requirements has resulted in the development of several corollary principles to the general rules of collateral estoppel. One such corollary was addressed by the Fourth Circuit in *Ritter v. Mount St. Mary's College*, 814 F.2d 986 (4th Cir.1987).

A corollary to the general rule of collateral estoppel is that, where the court in the prior suit has determined two issues, either of which could independently support the result, then neither determination is considered essential to the judgment. Thus, collateral estoppel will not obtain as to either determination. [Citation omitted.] If one of the two determinations is upheld on appeal, however, collateral estoppel can obtain as to that issue.

The rationale underlying this corollary to the collateral estoppel doctrine is that it guards against the use of non-essential dicta and ancillary findings to estop later litigations. The collateral estoppel doctrine seeks to further the judicial interest in economical resolution of disputes, although never to the point where a litigant is denied his full and fair opportunity to present his case to a competent fact finder. Non-essential findings should not serve as the basis for collateral estoppel because the litigants might not have concentrated their energies and resources upon the full development and presentation of these issues.

*Supra*, at 993–94.

■ In *Sandberg*, the Fourth Circuit Court of Appeals further recognized that "Courts generally apply issue preclusion only when no unfairness results." 979 F.2d at 343. The court then elaborated by stating:

Among the factors considered in evaluating fairness are whether the party had incentives to litigate fully an issue in the first instance and whether the role of the issue in the second action was foreseeable in the first action.

979 F.2d at 343. As was stated in *Ritter*,

The collateral estoppel doctrine is a judge-made rule, capable of flexible interpretation to serve the interests of judicial economy by preventing needless re-litigation. This flexibility is constantly limited by the overriding principle that the courts should protect a litigant's right to litigate his claims. As a result, extension of the doctrine of collateral estoppel to situations not involving the identical parties to the prior suit has rightly been undertaken with great caution.

814 F.2d at 994.

■ In denying Powers Construction's motion for relief from stay, the Court determined, under S.C.Code § 27–25–10, that the Debtor's grant (by way of Wilbur Powers acting for the Debtor without authority) of a note and blanket security interest to Powers Construction was void because it preferred Powers Construction as a creditor while the Debtor was insolvent. In doing so, the Court rejected arguments and legal theories advanced by Powers Construction that are identical to those put forward by the Defendants in this adversary proceeding.

The Defendants would have this Court ignore the findings of the previous Orders of

the Court as being restricted to Powers Construction's Motion for Relief from the Stay and therefore not applicable to the causes of action within. However, in determining that Powers Construction's security interest was void, this Court looked not only to the putative security agreement, but to the history of the Debtor's operations and the general business relationship and financial dealings between the Debtor, Wilbur Powers, and Powers Construction and also weighed the credibility of much of the same testimony and evidence presented by these same Defendants in this action. The inquiry into the relationship between the Debtor, Wilbur Powers, and Powers Construction was necessary for a determination of the issues before the Court in concluding as a matter of law that the security interest was void. These Defendants had a full and complete opportunity to litigate these matters before the Court. This Court's determination was affirmed by two appellate courts. The Court's determination of issues—affirmed without dissent by both the District Court and the Fourth Circuit—is part of the law of the case.

## II. First Claim for Relief: Trustee's § 547 Claim Against Powers Construction

In his first cause of action, the Trustee seeks recovery under § 547(b) of the amounts transferred from the Debtor to Powers Construction Company during the one year [4] prior to the filing of the petition initiating the Chapter 7. Section 547 of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

At trial, the Trustee relied upon the stipulated facts and the prior rulings of the Court to establish his right to recover, and Powers Construction conceded that the stipulated facts, and the inferences which could be deduced therefrom, established a *prima facie* case for the Trustee. Powers Construction contended, however, that the transfers to it were excepted from recovery under subsection (c) of § 547 or were subject to setoff under 11 U.S.C. § 553. Specifically, Powers Construction raises subsections (c)(2) as defense to the Trustee's 547 action and (c)(4) as a partial defense. As recognized in paragraph II(C) of the Conclusions of Law within, the Trustee does not dispute the applicability of the defense under (c)(4) to certain of the transfers. Thus, the Court need address only the defenses raised under § 547(c)(2) and § 553.

### A. Ordinary Course of Business Defense

▇▇▇▇▇ Powers Construction claims that the payments from the Debtor were payments in the ordinary course of business and therefore not avoidable pursuant to § 547(c). Under § 547(c)(2), the creditor bears the burden of showing (A) that the debt was incurred in the ordinary course of the Debtor's business, (B) that it was paid in the ordinary course of business, and (C) that it was paid according to ordinary business

---

**4.** Based upon stipulated facts, Wilbur Powers and Powers Construction were insiders pursuant to § 101 and § 547(b)(4)(B).

terms.[5] § 547(g). The application of this exception has recently been addressed by the Fourth Circuit Court of Appeals in the cases of *In re Jeffrey Bigelow Design Group, Inc.,* 956 F.2d 479 (4th Cir.1992), and *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044 (4th Cir.1994). In *Bigelow* the Fourth Circuit, noting that the Bankruptcy Code provided no guidance for determining when a transaction was within the "ordinary course of business," under § 547(c)(2)(A) & (B), quoting *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739, 743 (6th Cir.1989), stated:

> Describing the process for determining whether these ordinary course of business requirements are met, the Sixth Circuit stated that the "focus of [the] inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration."

*Bigelow,* 956 F.2d at 486. "Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2), (A) and (B) if those transactions were consistent with the course of dealings between the particular parties." *In re Fulghum Const. Corp.,* 872 F.2d 739, 743 (6th Cir.1989). In *Advo–System* the Fourth Circuit elaborated on the analysis to be applied in determining if the requirement of § 547(c)(2)(C) has been met, following decisions from the Seventh and Third Circuits, *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029 (7th Cir.1993); and *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.),* 18 F.3d 217 (3d Cir.1994). The focus under subsection (C) is on whether the transaction is "in harmony with the range of terms prevailing as some relevant industry's norms." *Advo–System,* 37 F.3d at 1050 (4th Cir.1994); *Molded Acoustical,* 18 F.3d at 226. The extent to which a transaction may vary from those "industry norms" will in turn depend upon the length of time over which "the pre-insolvency relationship between the debtor and

creditor was solidified." *Molded Acoustical,* 18 F.3d at 220 (emphasis in original).

In applying these standards it appears that the essential preliminary question is whether the subject transaction was the result of any unusual action by the specific debtor or creditor.

In the instant case, this Court and the District Court have already found that Wilbur Powers and Powers Construction at the direction of Wilbur Powers, took over the Debtor for the purpose of winding up its business before any of the payments at issue here were made. Mr. Green, Powers Constructions' accountant who provided bookkeeping services for the Debtor, testified that during the year before the Debtor's bankruptcy, the Debtor was in the process of closing its business and was *not* operating ordinarily. The Debtor therefore had no ordinary course of business within the requirements of § 547(c) at this time, and for that independent and adequate reason neither the debts nor the payments were in the ordinary course.

Powers Construction also presented evidence from Mr. Green that there was no change in the payment relationship between Powers Construction and the Debtor from 1988 onward, and indeed Wilbur Powers himself testified that there was no change in the course of dealing between the two companies during the Debtor's entire existence. However, the *Advo* decision makes it clear that the third element, that the debt was paid according to ordinary business terms, is an objective test. The Fourth Circuit specifically rejected the argument that "business terms are not unusual so long as they are consistent with the terms used between the Debtor and this particular creditor in their prior course of dealing," *Id.* at 1047–48, and held instead that § 547(c)(2)(C) "requires [the Court] to look to the norm in the creditor's industry when determining whether preference payments were made ac-

---

**5.** 11 U.S.C. § 547(c)(2) provides that a trustee may not avoid a transfer to a creditor to the extent that the transfer was

  (A) in payment of a debt incurred by the debtor in the ordinary course of business and financial affairs of the debtor and the transferee;

  (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

  (C) made according to ordinary business terms; ....

cording to ordinary business terms." *Id.* at 1048. Even if Powers Construction and the Debtor generally followed certain business practices while the Debtor operated under Mr. Hoffman's direction, that alone does not satisfy Powers Construction's burden under § 547(c)(2)(C).

As the Fourth Circuit stated:

In summary, we hold that subsection C requires an objective analysis ... [W]e read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows a creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C. *Molded Acoustical,* 18 F.3d at 226.

*Advo–System,* 37 F.3d at 1050. However, the court cautioned, this approach "never tolerates a gross departure from the industry norm, not even when the parties have had an established and steady relationship." *Id.* In *Advo,* the Court presumed for the sake of argument that the creditor itself *was* the industry, but still ruled as a matter of law that the ordinary course defense was not established because Advo's actions were unusual even for it.

Powers Construction suggests, citing *Advo* as authority, that the relevant "industry norm" in this case is for an industry comprised of entities in which Wilbur O. Powers has an ownership interest.

The Debtor also sought to establish as the "industry norm" that the arrangement between Powers Construction and the Debtor was "very similar to a line of credit" in the banking or lending industry, similar to its lending arrangement with other entities controlled by Wilbur Powers, and similar to Powers Construction's arrangement with its own bank. Although Powers Construction asserted that such commercial lending arrangements are not unusual and are utilized in the construction industry, Powers Construction presented no evidence that a similar arrangement is used by anyone else in the construction industry other than companies controlled by Wilbur Powers. Moreover, the Court cannot agree with Mr. Green's opinion that the Debtor and Powers Construction relationship was just like a normal line of credit arrangement from a bank. Strong evidence in support of this conclusion exists by SCN's apparent refusal to maintain its line of credit directly with the Debtor. In fact, Mr. Green admitted that no bank would have made a loan like the one Powers Construction made to the Debtor.

Despite Wilbur Powers' assertion to the contrary, the credible evidence presented to the Court shows that the Debtor and Powers Construction relationship was *not* the same during the year preceding bankruptcy as it had previously been, because, shortly before that time, Powers Construction took possession of all the Debtor's assets and assumed control of operations.

Because of the lack of credible evidence indicating an industry norm other than the construction industry at large, together with the law of the case that Wilbur Powers and Powers Construction through Wilbur Powers took over the Debtor's business in May 1989 for the purpose of "orchestrating the corporations so that his debt, both personally and as Powers Construction, was satisfied first", *In re Hoffman Associates,* No. 4:91–3540–21, slip op. at 6 (D.S.C., 7/27/92) (aff'd by unpublished per curiam opinion no. 92–2260, 1993 WL 539457 (4th Cir.1993)), the Court finds that Powers Construction has failed to satisfy its burden of proving that the transfers the Trustee seeks to avoid were made in the ordinary course of business pursuant to § 547(c)(2).

### B. "Setoff" Defense

■ Powers Construction also asserts that it has a "setoff" defense to the Trustee's preference claim. Section 553(a) provides

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

This provision of the Code " 'does not create a right of setoff.... It merely preserves any right of setoff accorded by state law....' " *In re Nat Warren Contracting Co., Inc.*, 905 F.2d 716, 718 (4th Cir.1990), quoting *Durham v. SMI Indus. Corp.*, 882 F.2d 881, 883 (4th Cir.1989).

■ Powers Construction argues that the Debtor's right to the return of property due to this Court's voiding of the alleged security interest taken by Powers Construction in the Debtor's assets is in effect a prepetition debt or claim which may be offset by Powers Construction's own prepetition claim for loans, services, or advances. In its responsive pleadings to the Trustee's Motion for Partial Summary Judgment, Powers Construction asserted that after the "rescission" of the Security Interest, "[a]pplication of the new value defense does not effect a full return to the status quo generally required when rescission is allowed, ... and to the extent that Powers Construction is not given credit for funds which it advanced to the Debtor it has a claim against the Debtor for money had and received which may be offset against funds of the Debtor which it holds."

Powers Construction fails to recognize that the Security Interest was *not* "rescinded," but rather was "absolutely null and void and of no effect whatsoever." S.C.Code § 27–25–10. There is no authority to support the argument that this nullity allows Powers Construction to assert setoff rights and, in effect, advance ahead of other creditors. While it may be true that Powers Construction has a claim for monies it advanced to the Debtor and was not repaid, this claim is nothing more than an unsecured claim. Powers Construction has no state law setoff right to enforce here.

## C.  Amount of the Preference

■ As the United States Court of Appeals for the Fourth Circuit has explained, each transaction in which the creditor gives new value to the Debtor is netted only against the immediately preceding preference. *Crichton v. Wheeling Nat'l Bank (In re Meredith Manor, Inc.)*, 902 F.2d 257, 258–59 (4th Cir.1990). Under this approach, the creditor may not build up credit to apply against subsequent preferences. Applying proper credits for subsequent advances, there was a net preference of $130,552.22, calculated as follows:

| Date | Preference | Subsequent Extension of Credit | Net Preference |
|---|---|---|---|
| 07–17–89 | 25,000.00 | | 25,000.00 |
| 07–21–89 | 10,000.00 | | 35,000.00 |
| 07–24–89 | | 15,000.00 | 20,000.00 |
| 07–28–89 | | 10,000.00 | 10,000.00 |
| 08–02–89 | | 2,000.00 | 8,000.00 |
| 08–04–89 | | 6,000.00 | 2,000.00 |
| 08–09–89 | | 8,000.00 | 0 |
| 08–10–89 | 10,000.00 | | 10,000.00 |
| 08–11–89 | | 10,000.00 | 0 |
| 08–17–89 | | 1,000.00 | 0 |
| 08–18–89 | | 4,000.00 | 0 |
| 08–21–89 | | 5,000.00 | 0 |
| 08–24–89 | | 5,000.00 | 0 |
| 08–28–89 | | 6,000.00 | 0 |
| 08–30–89 | 5,000.00 | | 5,000.00 |
| 09–07–89 | | 10,000.00 | 0 |
| 09–11–89 | | 5,000.00 | 0 |
| 09–12–89 | | 28,000.00 | 0 |
| 09–15–89 | | 5,000.00 | 0 |
| 09–19–89 | 6,000.00 | | 6,000.00 |
| 09–21–89 | 60,000.00 | | 66,000.00 |
| 09–25–89 | | 5,000.00 | 61,000.00 |
| 09–28–89 | | 19,500.00 | 41,500.00 |
| 10–02–89 | | 4,000.00 | 37,500.00 |
| 10–03–89 | 10,000.00 | | 47,500.00 |
| 10–04–89 | 15,000.00 | | 62,500.00 |
| 10–10–89 | | 1,000.00 | 61,500.00 |
| 10–11–89 | | 7,000.00 | 54,500.00 |
| 10–19–89 | 5,000.00 | | 59,500.00 |
| 10–20–89 | | 11,000.00 | 48,500.00 |
| 11–13–89 | 4,000.00 | | 52,500.00 |
| 11–21–89 | 2,000.00 | | 54,500.00 |
| 11–27–89 | | 4,000.00 | 50,500.00 |
| 11–28–89 | | 5,000.00 | 45,500.00 |
| 12–18–89 | | 7,000.00 | 38,500.00 |
| 01–01–90 | | 9,241.36 | 29,258.64 |
| 01–11–90 | 13,000.00 | | 42,258.64 |
| 01–24–90 | 5,000.00 | | 47,258.64 |
| 01–29–90 | 16,000.00 | | 63,258.64 |
| 02–01–90 | | 9,050.42 | 54,208.22 |
| 02–01–90 | 41,000.00 | | 95,208.22 |
| 02–05–90 | 32,000.00 | | 127,208.22 |
| 02–08–90 | | 3,200.00 | 124,008.22 |
| 02–09–90 | | 21,000.00 | 103,008.22 |
| 02–13–90 | | 500.00 | 102,508.22 |
| 03–01–90 | | 4,000.00 | 98,508.22 |
| 03–05–90 | 29,000.00 | | 127,508.22 |
| 03–07–90 | 8,000.00 | | 135,508.22 |
| 03–19–90 | 1,000.00 | | 136,508.22 |
| 03–21–90 | 3,000.00 | | 139,508.22 |
| 03–23–90 | | 10,000.00 | 129,508.22 |
| 04–01–90 | | 4,825.61 | 124,682.61 |
| 04–02–90 | 14,000.00 | | 138,682.61 |
| 04–06–90 | | 1,500.00 | 137,182.61 |
| 04–25–90 | 9,500.00 | | 146,682.61 |
| 05–01–90 | | 4,358.72 | 142,323.89 |
| 05–10–90 | | 7,460.00 | 134,863.89 |
| 06–01–90 | | 4,311.67 | 130,552.22 |

■ Having found that the Trustee's claim for preference is valid for the one year period prior to the petition date, and after applying the new value formula, the Trustee is entitled to judgment against Powers Construction Company on its First Claim for Relief in the amount of $130,552.22.[6]

### III. Second Claim for Relief: Trustee's § 547 Claim Against South Carolina National Bank

The Trustee in his Second and Third claims seeks recovery from SCN and Wilbur Powers respectively of two payments as preferences under § 547: the first in the amount of $19,280.64 occurring on September 28, 1989, and the second in the amount of $4,638.25 occurring on November 27, 1989, for a total claim of $23,918.89. SCN has conceded that the Trustee has met its burden of proving the elements of § 547. By Order dated January 6, 1995, the Court ruled that:

The Court will follow *Deprizio's* literal reading of the Code, and allow recovery by the Trustee from the initial transferee of a transfer for the benefit of an insider guarantor. The transferee may avoid such recovery by the Trustee if the transferee can show that such recovery would be inequitable in the circumstances of a specific case.

Here, the Court finds that SCN has not presented sufficient evidence of such extraordinary circumstances to establish that recovery by the Trustee would be inequitable in the circumstances of this case and permit the Court to deny the application of the *Deprizio* doctrine.

■ Accordingly, the only remaining defense to this claim raised by SCN in this matter is its invocation of the "earmarking" doctrine.[7] An excellent discussion of this doctrine and its rationale and application appears in the Fifth Circuit case of *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351 (5th Cir.1986):

For a preference to be voided under section 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." [Citations omitted]. If all that occurs in a "transfer" is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of the estate; he still owes the same sum to a creditor, only the identity of the creditor has changed. This type of transaction is referred to as "earmarking," and is, according to a noted bankruptcy treatise, applicable in the following circumstances:

"In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in

---

6. At trial, the Court understood Powers Construction to be asserting a right to some credit against this liability for management services provided to the Debtor and for rent on a building housing materials belonging to the Debtor during the year preceding bankruptcy. Powers Construction has apparently abandoned this position, making no reference to it in the proposed order it submitted. In any event, the position is without merit. Powers Construction did not timely file a proof of claim which asserted such a claim affirmatively in this bankruptcy proceeding, and if Powers Construction ever had a right to such a credit, it has waived such right. Moreover, the Debtor had no operations after the time the last management fee was paid in October of 1989, and the Debtor's only use and occupancy of a building owned by Wilbur Powers was through the storage of property of which Powers Construction had already taken possession and in

which it at that time asserted a security interest. Therefore, Powers Construction is not entitled to any credit against its preference liability on account of rent or management fees.

7. Counsel for Wilbur Powers, conceded that there is no ordinary course defense for these payments. The Court presumes that SCN has also abandoned this defense. In any event, the Court finds that SCN has not shown that the erratic payments, including the payment of four installments at once, constitute payments in the ordinary course of business for purposes of § 547(c)(2). See, e.g., *In re Vunovich,* 74 B.R. 629, 631 (Bankr.D.Kan.1987) (loan repayment greatly exceeding ordinary monthly payment amount was not according to ordinary business terms).

satisfaction of his claim, so long as such proceeds are clearly 'earmarked.'" 4 *Collier on Bankruptcy* ¶ 547.25 at 547–(101–102) (15th ed. 1986).

The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate.

797 F.2d at 1355–6. See also *In re Hartley*, 825 F.2d 1067 (6th Cir.1987).

The Court finds that the earmarking doctrine does not apply under the facts of this case for two reasons: (1) The doctrine is not available to a party who was not a guarantor of the payment made with allegedly "earmarked" funds; and (2) there was no evidence of any specific "earmarking" agreement regarding the application of the funds advanced.

■ The Eighth Circuit, in the case of *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.),* 859 F.2d 561, 566 (8th Cir.1988), explained the "earmarking" doctrine, a court-made interpretation of the requirement that a voidable preference must involve a "transfer of an interest of the debtor in property," as follows:

> In every earmarking situation there are three necessary dramatis personae. They are the "old creditor", (the pre-existing creditor who is paid off within the [preference period]), (here SCN), the "new creditor" or "new lender" who supplies the funds to pay off the old creditor (here, Powers Construction), and the debtor (here, Hoffman Associates).

> When new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference.

Id. at 565. As the Eighth Circuit explained, the doctrine developed in cases where a guarantor provided the bankruptcy debtor funds to pay off the guaranteed debt, because that is functionally no different from the non-preference activity of the guarantor paying it himself. *Id.* at 565–66. If the payment was avoided as a preference, the old creditor will return the payment to the Debtor and then pursue the guarantor, who may be forced to pay twice, and the doctrine was developed to protect against such possibility of double payment. As the Eighth Circuit elaborated, the doctrine has been extended beyond the guarantor situation, but in well-considered dicta the Eighth Circuit disagreed with such an application:

> Where there is no guarantor, the earmarking doctrine does not help either the new creditor or the debtor. In fact the new creditor is harmed. He is a general creditor whose recovery must come from a debtor's estate which is diminished to the extent that the payment made to the old creditor cannot be recovered as a preference. The only person aided by the doctrine is the old creditor, who had nothing to do with earmarking the funds, and who, in equity, deserves no such benefit.

Id. at 566.

■ This Court has found no Fourth Circuit law directing the application of the earmarking doctrine beyond the guarantor situation, and for the reasons set forth in the *Bohlen* case the Court declines to do so. For that reason alone, the earmarking doctrine is not a defense to the Trustee's preference claim against SCN, because Powers Construction, who advanced the funds, was not a guarantor. As previously determined by this Court (Judge Davis) in its July 31, 1991 Order, the debt to SCN was guaranteed by Wilbur Powers and "[t]he payments made by Powers Construction on the SCN promissory note reduced Wilbur Power's contingent liability, and diminished the Debtor's assets to the detriment of other creditors who did not have recourse to Wilbur Powers". *In re Hoffman Associates, Inc.,* No. 90–02419, slip op. at 7 (Bankr.D.S.C., 7/31/91).

■ Moreover, the doctrine has no application on the facts of this case, because the transactions in this case fail to satisfy the basic elements of the earmarking defense. The earmarking defense requires (1) that there be an agreement regarding application of the funds advanced by the "new creditor"

(Powers Construction); (2) that the agreement be performed according to its terms; and (3) that the transaction as a whole "does not result in any diminution of the estate." *Bohlen,* 859 F.2d at 566.

Here, although Wilbur Powers himself directed the Debtor to prefer SCN's claim to that of other creditors, there was no evidence of an agreement between Powers Construction and the Debtor for the Debtor to use the specific funds transferred to repay the SCN loan. Rather, Powers Construction's method was to essentially keep the Debtor's bank account with a "zero balance," placing just enough money into the account to cover checks presented for payment and taking out any excess funds not immediately needed to cover checks. Wilbur Powers testified that, pursuant to this general arrangement, the deposits to cover the SCN payments were "just like any other check. The check was generated, was issued, and the check was presented to the bank, and Powers Construction provided the funds to cover that, just like it had done at all the other times." Further, Glenn Cantrell of SCN testified that he did not know of any earmarking agreement. Accordingly, the funds at issue were not "earmarked" even if the earmarking doctrine was applicable to this case as a matter of law.

The transactions in this case also fail to satisfy the third requirement, that the transaction not result in any diminution of the estate. Under § 541(a)(3), property of the estate includes any amounts recovered by the trustee under § 550. Thus, property of the estate includes any amounts recovered as preferences. If the earmarking doctrine were applied here, the property of the estate would be reduced because the funds provided by Powers Construction would be credited as subsequent advances of new value and would thus diminish the preference recovery from Powers Construction.

On the Trustee's Second Claim for Relief, against SCN under § 547, the Trustee is entitled to judgment in the amount of $23,918.89, recoverable severally together with the judgment against Wilbur Powers on the Third Claim for Relief. As stipulated by counsel for Wilbur Powers, SCN is entitled to be indemnified by Wilbur Powers for a like amount and therefore is entitled to judgment on its Cross Claim.

### IV. Third Claim for Relief: Trustee's § 547 Claim against Wilbur Powers

Wilbur Powers has conceded that the Trustee has met his burden to establish the elements under § 547(b) of its claim seeking recovery of payments totalling $23,918.89 to SCN on loans to the Debtor that were personally guaranteed by Wilbur O. Powers. Powers' only defense to the claim is under the earmarking doctrine. For the reasons stated above, the earmarking doctrine provides Wilbur Powers no defense, and the Trustee is entitled to judgment against Powers on the Third Claim for Relief in the amount of $23,918.89, recoverable severally together with the judgment against SCN on the Second Claim for Relief.

### V. Fourth and Sixth Claims for Relief: Trustee's Claims for Fraudulent Transfers and Fraudulent Conveyances with respect to the Full Amount of the Transfers from the Debtor to Powers Construction during the Year Preceding the Bankruptcy

In the Fourth and Sixth causes of action, the Trustee seeks recovery of the amounts transferred from the Debtor to Powers Construction as fraudulent conveyances under § 548 and S.C.Code § 27-23-10, respectively. Both the Bankruptcy Code and the South Carolina Code provide that transfers made with the intent to hinder, delay, or defraud creditors may be avoided. Under each of these statutes the Trustee also has a right to set aside transfers for which the Debtor received less than reasonably equivalent value.

Section 548(a) provides in relevant part,

(a) The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder,

delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted....

Similarly, § 27–23–10 of South Carolina Code provides that transfers made "for any intent or purpose to delay, hinder or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties and forfeitures" are "utterly void, frustrate and of no effect."

The Defendant takes the position that there is no evidence to support a finding that Powers Construction or Wilbur Powers made the transfers at issue with the intent to hinder, delay, or defraud the other creditors of the Debtor and that the transfers were made in accordance with a long standing course of dealing between the Debtor and Powers Construction. This Court disagrees.

In this Court's Order of July 31, 1991, Judge Davis found that "... all of the activities of the debtor, subsequent to June 22, 1989, and all payments to employees and suppliers were for the purpose of completing jobs for which Wilbur Powers personally was liable. It appears, therefore, that the entire amount of advances thereafter made by Powers Construction was used to pay liabilities for which Wilbur Powers was surety. The Debtor's other creditors to whom Wilbur Powers was not personally accountable did not receive payment and received no benefit from these payments." *In re Hoffman Associates, Inc.,* No. 90–02419, slip op. at 7 (Bankr.D.S.C., 7/31/91).

Additionally, in the District Court's Order of July 27, 1992, Judge Traxler found that "all of Hoffman Associates' activities since June 22, 1989—the date Wilbur Powers executed the note and security agreement from the debtor in favor of Powers Construction— were for the purpose of finishing jobs for which Wilbur Powers was personally liable— undeniably a benefit." *In re Hoffman Associates,* No. 4:91–3540–21, slip op. at 6 (D.S.C., 7/27/92) (aff'd by unpublished per curiam opinion no. 92–2260, 1993 WL 539457 (4th Cir.1993)). Judge Traxler also found that:

The effect was this: Wilbur Powers' corporation was paying a debt that Wilbur Pow-

ers personally guaranteed; the debtor for whom the debt was being paid was also directed by Wilbur Powers. Thus, Wilbur Powers was paying debts to himself; and the corporations were merely media for doing this. Stripped to its essentials, therefore, the present action presents this picture: Wilbur Powers, sole director of Hoffman Associates and principal; owner of one of the debtor's creditors, executed a note and security agreement from Hoffman Associates to Powers Construction, a corporation owned by Wilbur Powers. Thus, we have a single man as a director of two corporations, which, given that one is the debtor and one is a creditor, should have adverse interest.

*Id.,* slip op. at 7.

The Trustee's argument with respect to his claims under Federal and State fraudulent conveyance law, relies almost exclusively on the Trustee's interpretation of the orders of the Bankruptcy Court and District Court entered in connection with the motion for relief from stay filed on behalf of Powers Construction.

■ Earlier findings by this Court in denying the motion by Powers Construction for relief from stay, as well as the decision of Judge Traxler of the District Court affirming this Court's ruling, established clearly that Wilbur Powers and Powers Construction upon the direction of Wilbur Powers, upon the death of Bobby Hoffman, took over the daily operations and finances of the Debtor for the purpose of insuring that the money owed to Powers Construction was paid. As found by Judge Davis in the Courts Order of July 31, 1991, and reiterated by Judge Traxler in the appeal to the District Court entered July 27, 1992, "[Wilbur] Powers has conceded that the purpose of Powers Construction's efforts in winding down the debtor's business was to reduce the debtor's antecedent debt to Powers Construction". As this Court and the District Court have found, Wilbur Powers executed a plan that would allow him to receive payment on his debt the moment the Debtor had any excess cash. Other creditors, with the notable exception of those who would have had claims against

Wilbur Powers personally based on his guarantees of the Debtor's obligations, were left with no recourse. This finding constitutes the necessary intent to hinder, delay or defraud creditors required by the Federal and State fraudulent conveyance statutes.

The Defendants assert that this portion of this Court's previous Orders as well as the appellate Orders are collateral factual findings and dicta and are not controlling in the within preceding. As stated previously in the collateral estoppel discussion, in order to make its determination as to the voiding of the security agreement, it was necessary for this Court to not only look to the alleged security agreement, but to the entire underlying business and financial relationship between the Debtor, Wilbur Powers and Powers Construction. This Court and the appellate courts thoroughly considered this relationship. The Defendants had a complete opportunity to litigate these issues, not only in this Court but on appeal. For this reason, this Court finds that the referenced previous Orders and their findings are not collateral to the issues presently before the Court but are relevant and binding on this Court.

Accordingly, the Court finds that the entire amount of the transfers from the Debtor to Powers Construction during the year preceding the bankruptcy, totaling $323,500.00, were fraudulent transfers, and the Trustee is entitled to recover such amount from Powers Construction.[8]

## VI. Fifth and Sixth Claims for Relief: Trustee's Claims for Fraudulent Transfers and Fraudulent Conveyances with respect to Management Fees Paid to Powers Construction

In the Fifth and Sixth Claims for Relief, the Trustee asserts that the payments of $8,000 in management fees by the Debtor to Powers Construction from July 1989 through October 1989 were fraudulent transfers voidable and recoverable under §§ 548 and 550 or fraudulent conveyances pursuant to S.C.Code § 27–23–10, voidable and recoverable pursuant to §§ 544(b) and 550(a).

■ The Trustee asserts that during the time after the death of Mr. Hoffman, when Powers Construction received payments totaling $8,000 for "management fees," the services performed by Powers Construction were not for the benefit of the Debtor but were instead solely for the benefit of Powers Construction itself. The testimony at trial, however, established that Powers Construction had historically performed various "overhead type" services for the Debtor in return for these payments. Charles Green testified that Powers Construction provided the Debtor services including bookkeeping, banking, telephone answering service, and computing services. Wilbur Powers testified that in addition to the regular services provided to the Debtor prior to Mr. Hoffman's death, Powers Construction, through its employees, provided all of the actual supervision of the Debtor's ongoing construction work after Mr. Hoffman's death. Powers Construction was also responsible for all of the collection Debtor's receivables up to and even after the filing of the chapter 7 petition. The testimony additionally shows that the overhead services provided by Powers Construction after Mr. Hoffman's death were the same as those provided prior to his death. Therefore, the Court finds that the Trustee has not met his burden of proof pursuant to § 548 under this claim and therefore Powers Construction is entitled to judgment on the Trustee's fifth and sixth claims as to the management fees.

## VII. Seventh Claim for Relief: Trustee's Claim for Recovery of Unlawful Dividends from Wilbur Powers

■ Under the Seventh Claim for Relief, the Trustee has asserted that certain payments from the Debtor to Wilbur Powers constituted unlawful dividends pursuant to S.C.Code § 33–6–400(c) that may be avoided by the Trustee pursuant to § 544(b) and recovered on behalf of the Debtor's estate pursuant to § 550(a)(1). S.C.Code § 33–6–400(c) prohibits distributions to shareholders if, after such distributions, the corporation is not able to pay its debts as they become due

---

**8.** According to his pleadings, the Trustee's recovery of this amount is an alternative recovery to the $130,552.22 as a preference, not an additional recovery.

or its assets are less than the sum of its total liabilities.

Prior to Mr. Hoffman's death, Wilbur Powers was not active in the day-to-day management of the Debtor as an officer, director or employee, and was instead basically a "financial backer" for the company. However, Wilbur Powers has testified at deposition that he was paid approximately $450 to $500 by the Debtor every week from the time of incorporation until December 1989. At trial, Mr. Powers admitted that he drew monies from the Debtor but could not recall whether it was as an employee or not. The Debtor's federal tax returns show that Mr. Powers was paid $39,658 by the Debtor during its fiscal year 1989 and $50,000 by the Debtor during its fiscal year 1988.

According to the testimony of Wilbur Powers, those payments were to balance payments that were made to Bobby Hoffman, and were distributed based on the ownership share that Wilbur Powers had in the Debtor corporation in order to give him his "fair share of profits." Moreover, they were in addition to management fees Powers Construction received from the Debtor for services which included those actually provided to the Debtor by Wilbur Powers among others. Such payments, being directly based on Wilbur Powers' share holdings, constitute dividends. See *Gable v. South Carolina Tax Commission*, 189 S.C. 346, 1 S.E.2d 244, 246 (1939), 11 W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5318 (Perm. ed. 1986).

Wilbur Powers argues that it is unclear how much of the total payment may be said to be a dividend as opposed to payment for the services which he provided the Debtor and that part of the Trustee's proof on this issue rests upon a 1987 income tax return which includes amounts paid from October of 1987 through September 1988, a period which includes nine months of payments from a time period more than two years prior to the filing of the petition.

In his Rule 2004 examination testimony, which was admitted into evidence by consent of the parties, when asked whether payments he had received over the years were "in part designed to make sure [he] got [his] equal share of the profits," Wilbur Powers testified, as follows:

It was really—Well, I guess you'd have to say both, but in the mechanics of setting it up, of course, we did it under the guise of me receiving monies that I was due for services rendered. But the basis of it, of course, was repayment or payment for my share of monies that I would be due otherwise.

Additional evidence presented at trial showed that Wilbur Powers received $89,658 from the Debtor during a time when the Debtor was insolvent.

South Carolina law prohibits distributions to shareholders if, after such distributions, the corporation is not able to pay its debts as they become due or its assets are less than the sum of its total liabilities. S.C.Code § 33-6-400(c). As stated in the financial statements of the Debtor for the fiscal years ending September 30, 1988 and September 30, 1989, and as found by this Court in its July 31, 1991 Order, the Debtor was insolvent by September 30, 1988, and the Court therefore finds that the total of $39,658 paid to Powers during the Debtor's fiscal year of 1989 constituted unlawful dividends. Therefore, the Trustee is entitled to judgment against Powers on the Seventh Claim for Relief in the amount of $39,658. As to the payment of $50,000 by the Debtor during the fiscal year 1988, the Court finds that the Trustee has failed to present sufficient evidence as to the Debtor's insolvency during this period and therefore finds in favor of the Defendant Wilbur Powers.

### VIII. Eighth Claim for Relief: Trustee's Request to Disregard the Corporate Identity of the Debtor and to Recover from Wilbur Powers and Powers Construction Amounts Sufficient to pay the Claims of the Debtor's Unsecured Creditors

The Trustee in the Eighth claim for relief seeks to pierce the corporate veil of the Debtor and hold Wilbur Powers and Powers Construction liable for all amounts due creditors of the Debtor. Under certain circumstances courts have held corporate shareholders liable for the debts of the corporation

under a theory that the corporation was a mere instrumentality or the alter ego of its shareholders.

In the Fourth Circuit it appears that the principal case on this issue is *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976). From these cases it is clear that, "This power to pierce the corporate veil, though, is to be exercised 'reluctantly' and 'cautiously' and the burden of establishing a basis for the disregard of the corporate fiction rest on the party asserting such claim." 540 F.2d at 683.

In deciding whether to pierce the corporate veil, a number of factors should be considered including whether the corporation was grossly undercapitalized, whether there was a failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder. *DeWitt*, 540 F.2d at 685–87. *DeWitt* goes on, however, to hold that:

> The conclusion to disregard the corporate entity may not, however, rest on a single factor, whether under-capitalization, disregard of the corporation's formalities, or what-not, but must involve a number of such factors; *in addition*, it must present an element of injustice or fundamental unfairness. (Emphasis added).

540 F.2d at 687. Thus, under *DeWitt* there is essentially a two prong test which must be applied before the corporate veil may be pierced.

As to the first prong of the *DeWitt* test, the evidence in this case establishes that the corporate debtor initially had three shareholders and then later two, Wilbur Powers and Bobby Hoffman. Until his death, it was Bobby Hoffman and not Wilbur Powers who controlled the day to day operation of the Debtor. However, after Mr. Hoffman's death, Wilbur Powers assumed control of the Debtor as the only remaining officer of the corporation. The evidence is clear that while the Debtor was initially profitable, af-

ter Wilbur Powers took over control, the Debtor became grossly undercapitalized and insolvent. While under the control of Wilbur Powers, as discussed previously, he applied the assets of the Debtor to his own interest above those of other creditors. Judge Davis' Order of July 31, 1991, in which the court voided the security agreement entered into by Powers Construction and the Debtor found that:

> Wilbur Powers, unbeknownst to Gloria Hoffman, nevertheless executed a promissory note (the "Note"), dated June 22, 1989, on behalf of the debtor in favor of Powers Construction and a security agreement (the "Security Agreement"), pledging to Powers Construction a security interest in almost all of the debtor's assets … Powers, in his individual capacity and as a director of Powers Construction, knew when he executed the Note and the Security Agreement, that the debtor was insolvent.

*In re Hoffman Associates, Inc.*, No. 90–02419, slip op. at 4 (Bankr.D.S.C., 7/31/91).

Judge Davis further found that the by-laws of the Debtor provide that only its president has the authority to sign notes and mortgages and then only after authorization from a resolution of the board and that "Wilbur Powers conceded that the debtor's board of directors never held a meeting to authorize the execution of the Security Agreement or the signing of the Notes, and that no resolution was ever passed for the purpose". *In re Hoffman Associates, Inc.*, No. 90–02419, slip op. at 5 (Bankr.D.S.C., 7/31/91).

As further developed by the extensive testimony and exhibits to this proceeding, it is clear to this Court that after the death of Mr. Hoffman, as the dominant and controlling shareholder, Wilbur Powers ran the Debtor corporation as a facade for his other companies operations. The evidence established that the Debtor, at this point if not before, was not an independent corporation. It was run out of a warehouse owned by Wilbur Powers or one of this other companies, the telephone system was part of Powers Construction's telephone system, the bookkeeping was provided by Wilbur Powers or one of his other companies and the checking ac-

count was controlled through Wilbur Powers or Powers Construction. As stated by Wilbur Powers at the hearing, he used Powers Construction like a bank to loan money to the other entities in which he was involved, including the Debtor. As further stated by Mr. Powers, he would control the cash to the various entities based upon their particular cash flow needs at the time:

> You would have—I would have different entities that might have, at some point in time, a negative cash flow, or a—or a, you know, a positive cash flow. So, all of the funds, if there were excess funds in those accounts, they were transferred back into the Powers Construction Company account and paid against the line at the bank.

Transcript of December 1, 1994 hearing, at page 138.

Based upon the evidence presented at the hearing before the Court, it is the finding of this Court that sufficient factors are present to pierce the corporate veil under the first prong of the *DeWitt* test.

As to the second prong of the *DeWitt* test or the "element of injustice or fundamental unfairness", Wilbur Powers posits the argument that after the death of Mr. Hoffman, he had no choice but to take over the operations of the Debtor and that by doing so, he was able to begin winding down the business which was a benefit to all of the creditors. However, as this Court has previously held, shortly after Wilbur Powers assumed control of the Debtor, he undertook to grant Powers Construction a security interest in substantially all of the Debtor's assets. Additionally, as the previous findings of this Court lead directly to the conclusion that, for at least a year prior to the filing of the petition in this case, Wilbur Powers and Powers Construction so dominated the Debtor in its transactions with its creditors that the Debtor had no independent identity and was an instrumentality of the will of Wilbur Powers and Powers Construction. As found by Judge Davis in this Court's Order of July 31, 1991, the granting of the security interest after the death of Mr. Hoffman in favor of Powers Construction "was not fair to the corporation", referring to the Debtor. As stated previously, in the July 27, 1992 Order of the

District Court, Judge Traxler found that "all of Hoffman Associates' activities since June 22, 1989—the date Wilbur Powers executed the note and security agreement from the debtor in favor of Powers Construction— were for the purpose of finishing jobs for which Wilbur Powers was personally liable— undeniably a benefit" and that "[t]he effect was this: Wilbur Powers' corporation was paying a debt that Wilbur Powers personally guaranteed; the debtor for whom the debt was being paid was also directed by Wilbur Powers. Thus, Wilbur Powers was paying debts to himself; and the corporations were merely media for doing this ... [t]hus, we have a single man as a director of two corporations, which, given that one is the debtor and one is a creditor, should have adverse interest". *Id,* slip op. at 7. Wilbur Powers' argument that the equities (as a result of benefits received by creditors due to his actions to wind down the operations of the Debtor) should weigh in his favor must fail as a result of his "unclean hands".

Furthermore, when the Debtor became insolvent, the fiduciary duty owed by Wilbur Powers as a director of the Debtor, shifted from the stockholders to all of the creditors of the Debtor. *Federal Deposit Insurance Co. v. Sea Pines Co.,* 692 F.2d 973, 976–977 (4th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 299 (1982).

Under such circumstances, the Court finds that it may pierce the corporate veil and dispense with the fiction of the independent identity of the corporation upon the date of Mr. Hoffman's death and assumption of control by Wilbur Powers and Powers Construction Company. *Parker Peanut Co. v. Felder,* 200 S.C. 203, 20 S.E.2d 716, 721 (1942). Wilbur Powers, as the sole shareholder controlling the corporation after the death of Mr. Hoffman should be held liable for the corporate debts that arose after his taking control of the Debtor.

Accordingly, to the extent that the recovery as set forth in this Order is insufficient to provide funds to pay all Debtors' unsecured creditors, the Court finds that Wilbur Powers and Powers Construction through the control of Wilbur Powers, as the alter ego of the Debtor after the death of Mr. Hoffman in

April of 1989, is personally liable for all debts of the Debtor incurred after the death of Mr. Hoffman.

### IX. Ninth Claim for Relief: Trustee's Claim that the Claims of Powers Construction should be Subordinated to the Claims of all Hoffman's other Creditors

■ The Ninth claim in the Complaint seeks equitable subordination of the claim of Powers Construction to the claims of other creditors. Section 510(c) empowers the Bankruptcy Court to reorder the priority of claims based on equitable grounds. This statute provides:

> After notice and a hearing, the court may—
>
> (1) Under the principles of equitable subordination, subordinate for purposes of distribution all or a part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) Order that the liens securing such subordinated claim be transferred to the estate.

■ The principles relating to equitable subordination are well developed. "Generally equitable subordination involves a number of inquiries: 1) whether the claimant has engaged in fraudulent conduct, 2) whether the conduct resulted in injury to creditors and 3) whether subordination would be consistent with other bankruptcy law." *In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir.1991).

### A. Powers Construction has engaged in inequitable conduct.

■ The inequitable conduct of the claimant under § 510(c) generally involves conduct such as fraud, breach of fiduciary duty, illegality, under-capitalization, or use of the Debtor as an alter ego. See *Matter of Missionary Baptist Foundation of America,* 818 F.2d 1135 (5th Cir.1987); *In re Dan–Ver Enterprises, Inc.,* 86 B.R. 443, 448 (Bankr. W.D.Pa.1988). The Court gives especially close scrutiny to the conduct of the claimant when the claimant is an insider. *In re Bel-*

*lanca Aircraft Corp.,* 850 F.2d 1275, 1282, n. 13 (8th Cir.1988); *In re Ludwig Honold Mfg. Co., Inc.,* 46 B.R. 125, 128 (Bankr.E.D.Pa. 1986).

The courts have found that virtually any conduct by which an insider gains an advantage over creditors constitutes inequitable conduct for purposes of § 510(c). See, e.g., *Allied Eastern States Maintenance Corp. v. Miller (In re Lemco Gypsum, Inc.),* 108 B.R. 831 (Bankr.S.D.Ga.1988), aff'd in part, rev'd in part, 911 F.2d 1553 (11th Cir.1990) (claim subordinated when insider paid $30,000 and received assignment of judgment of $131,-945.51).

■ As stated previously in the Courts discussion on the Trustee's Eight Claim for Relief [The Trustee's request to disregard the corporate identity of the Debtor], the Court finds that the conduct of Powers Construction (as the instrument of Wilbur Powers) in this case was inequitable, especially when subjected to the heightened scrutiny of conduct of an insider.

### B. Injury to creditors and unfair advantage to claimant

When conduct is found which would warrant the application of equitable subordination, "the doctrine is remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *Matter of Fabricators, Inc.,* 926 F.2d 1458, 1464 (5th Cir.1991); *Trone v. Smith (In re Westgate–California Corp.),* 642 F.2d 1174, 1178 (9th Cir.1981); *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 701 (5th Cir.1977). Equitable subordination is appropriate where the conduct of the claimant causes injury to creditors or confers an unfair advantage on the claimant. *In re Mobile Steel,* 563 F.2d 692. The Court finds that Powers Construction gained an advantage as a result of its inequitable conduct, because it was enabled to effect the preferential transfers discussed above. In addition, the other creditors of the Debtor were harmed by the manner in which Wilbur Powers and Powers Construction at Wilbur Powers direction went about winding up the business operations of the Debtor. As dis-

cussed above, the inequitable conduct of Wilbur Powers and Powers Construction included a failure to provide adequate capitalization for the Debtor. The Supreme Court has recognized that under-capitalization inflicts harm on creditors that justifies equitable subordination:

It is impossible to recast Deep Rock's history and experience so as even to approximate what would be its financial condition at this day had it been adequately capitalized and independently managed and had its fiscal affairs been conducted with an eye single to its own interest.

*Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 323, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939).

### C.  Consistent with other provisions of the Code

Equitable subordination is consistent with other provisions of the Bankruptcy Code if it is consistent with the basic goal of equality of distribution in bankruptcy. A claimant whose inequitable conduct has harmed other creditors has skewed the prospects for equal distribution, and subordination corrects this. See, e.g., *In re Beverages Int'l Ltd.,* 50 B.R. 273, 284 (Bankr.D.Mass.1985).

The Court finds that the conduct of Powers Construction in this case satisfies all the elements of equitable subordination under § 510(c), and its claim should be subordinated in its entirety to all other unsecured claims of the Debtor.

### X.  Tenth Claim for Relief: Trustee's Claim that the SCN is entitled to setoff in the amount of $399.48.

As the final matter, by prior order, the Court directed that the amounts held in the Debtor's account at SCN be transferred to the Trustee. The Court, however, reserved for disposition in this proceeding SCN's right to claim a setoff of that amount against the amount owed by the Debtor to SCN at the time of the filing of the petition. As previously noted, the right to setoff mutual pre-petition claims is preserved by § 553. In South Carolina the bank-depositor relationship creates a debtor-creditor relationship between the bank and its deposit customer. The stipulated facts establish that at the time of the petition the Debtor had on deposit in its account the sum of $1,037.73. SCN in turn held a claim against the Debtor and has filed a proof of claim in the amount of $14,064.17. SCN's right to apply the deposit to its claim having been preserved, SCN is entitled to credit that amount against the preferential transfer in the Second Claim for Relief in order to allow it to exercise its right of setoff. Based upon the stipulation of the parties that SCN is also otherwise obligated for payment to the Trustee in the amount of $638.25, SCN is entitled to credit against the preferential transfer in the Second Claim for Relief, the amount of $399.48 based upon its right of setoff. SCN shall thereafter have twenty days after this Order becomes final and after receipt of the funds from the Trustee to file an amended proof of claim reflecting the amount owed by the Debtor at the time of the filing of the petition less any amounts set off.

### CONCLUSION

Based upon the foregoing, it is

**ORDERED,** that on the Trustee's First Claim for Relief, against Powers Construction under § 547, the Trustee is entitled to judgment in the amount of $130,552.22. It is further

**ORDERED,** that on the Trustee's Second Claim for Relief, against SCN under § 547, the Trustee is entitled to judgment in the amount of $23,918.89, recoverable severally together with the judgment against Wilbur Powers on the Third Claim for Relief. As stipulated, SCN is entitled to be indemnified by Defendant Powers for a like amount based upon SCN's Cross Claim. It is further

**ORDERED,** that on the Trustee's Third Claim for Relief, against Wilbur Powers under § 547, the Trustee is entitled to judgment in the amount of $23,918.89, recoverable severally together with the judgment against SCN on the Second Claim for Relief. It is further

**ORDERED,** that on the Trustee's Fourth and Sixth Claims for Relief, against Powers Construction for fraudulent transfers, the Trustee is entitled to judgment against Powers Construction in the amount of $323,-

500.00 as an alternative recovery to the Trustee's First Claim for Relief. It is further

ORDERED, that on the Trustee's Fifth And Sixth Claims for Relief, against Powers Construction for fraudulent transfers with respect to the payment of management fees, judgment is entered in favor of the Defendant Powers Construction. It is further

ORDERED, that on the Trustee's Seventh Claim for Relief, against Wilbur Powers for unlawful dividends, the Trustee is entitled to judgment in the amount of $39,658. It is further

ORDERED, that on the Trustee's Eighth Claim for Relief, the Court rules that the Trustee may disregard the corporate identity of Hoffman Associates from the date of Mr. Hoffman's death in April of 1989 and recover from Powers Construction and Wilbur Powers such funds as are necessary to pay all unsecured creditors in full. It is further

ORDERED, that on the Trustee's Ninth Claim for Relief, the Court rules that the claims of Powers Construction will be subordinated to the claims of all the Debtor's other creditors. It is further

ORDERED, that on the Trustee's Tenth Claim for Relief, the Trustee having conceded the issue, the Court rules that SCN is entitled to a credit against the preferential transfer claim in the Second Claim for Relief to the extent of funds that were on deposit as of the date of the petition.

AND IT IS SO ORDERED.